## Railroad Company *v.* Schutte.

1. A *supersedeas* will be vacated when the approval of the bond therefor was obtained by fraud and perjury.
2. If it appears that the appellant had knowledge of such fraud and perjury, a new bond will not be accepted.
3. The record in this case not being complete or properly certified, the court orders that unless appellant causes the omissions to be supplied on or before a specified day, the appeal be dismissed.

Motion to vacate the *supersedeas*, and dismiss an appeal from the Circuit Court of the United States for the Northern District of Florida.

The facts are stated in the opinion of the court.

*Mr. Matt. H. Carpenter* and *Mr. Wayne MacVeagh* in support of the motion.

*Mr. Philip Phillips* and *Mr. William A. Maury, contra.*

Mr. Chief Justice Waite delivered the opinion of the court.

In this case the appellees have moved, —

1. To vacate the *supersedeas*, because the approval of the *supersedeas* bond by the justice of this court, who allowed the appeal, was obtained by fraud and perjury ; and,

2. To dismiss the appeal, because the transcript of the record which has been filed in this court is not complete, and is not properly certified.

The appellants also have moved for leave to file a new bond in case the old one shall be set aside.

1. As to the vacation of the *supersedeas*.

That the approval of the bond was brought about by gross fraud and perjury is so conclusively shown that no attempt has been made to deny it. The evidence also shows with equal certainty that the bond was obtained in the most irregular way. A lawyer who, to say the least, was an entire stranger to all the parties in interest, was employed to procure, within thirty-six or forty-eight hours, sureties for the appellants sufficient to secure the payment of $100,000. He was to be paid for his services six bonds of $1,000 each of the Florida Central Railroad Com-

pany, the appellant corporation, which were then of no marketable value.    In due time he produced the requisite number of persons to sign as sureties.    When they came, the "usual form of justification of about four lines in length" was "ignored," and a full affidavit was drawn for each surety, wherein was set forth "the name and residence of the surety, the amount of real estate, its location, its value, whether or not incumbered, if so, to what amount; next, the amount of his personal property, its character, whether or not incumbered, and if so, to what amount; next, whether or not the surety was upon any other bond; next, whether or not there were any judgments against the surety; and finally summing up that he owned so much over all his debts and liabilities, naming the sum.    Each of these questions each surety answered favorably, and swore to.    The justifications were extraordinary in their minuteness, as the affidavits will show."

This being done, a bond sufficient in form was signed by the "procured" sureties.    One of the persons who signed, said to be a "very wealthy man," was paid $125 for what he did.    Another, "the son of a former judge of the Supreme Court of the State of New York," received $12.50; another, a colored porter in a lawyer's office, $10; another was paid $10; and another was promised $50, but actually paid nothing.    They were all irresponsible pecuniarily, and known to or suspected by the police of the city of New York as "purchasable sureties."    The money to pay them for their fraudulent work was furnished by an agent of the appellant company under the form of buying back one of the worthless bonds promised as a reward for what was done.

After the bond was executed by the sureties thus obtained, the president of the appellant corporation was called in.    He signed officially the name of the corporation, and affixed the corporate seal, but did not see, or ask to see, any of the persons who had become bound with his company.    Neither he nor any other person actually interested in the litigation became in any manner personally bound.

With such a bond, procured in such a way, the president of the corporation presented himself at the last moment to the justice of this court, who heard the cause in the Circuit Court at

his summer residence in Vermont, and asked that the bond be approved. On its presentation, as we are informed by the testimony of the president himself, the justice read and seemed to be impressed "with the fulness and particularity of the justifications." He said, "This seems to be a good bond." The reply was, "Yes, Judge, I believe it to be a very good bond." The justice then asked as to one of the parties whose name appeared, and the reply was, "I am informed that he is the son of a former judge of the Supreme Court of the State of New York of that name," adding that another of the signers, "I am advised, is a very wealthy man."

Under these circumstances, the bond was approved. To allow it to stand and to operate as a stay of execution upon an important decree until the case can be reached in its order on our crowded docket, would be a reproach upon the administration of justice. We are aware that in *Jerome* v. *McCarter* (21 Wall. 17) we said, "That, upon facts existing at the time the security was accepted, the action of the justice, within the statute and within the rules of practice adopted for his guidance, is final," and that we would "presume that when he acted, every fact was presented to him that could have been." We are not inclined to depart from that rule, but, in a case of this kind, fraud is always open to inquiry. When discovered, justice requires that summary relief should be afforded, whenever and wherever it may be done consistently with the forms of orderly judicial procedure. This bond is as much false as if it had been forged. The persons who signed it are not in fact what they were represented to be. We have no hesitation in setting aside the approval of the bond.

2. As to the acceptance of a new bond in the place of the old one.

This application is addressed to our judicial discretion, and is based on the alleged ignorance of the officers and agents of the appellant corporation as to the character of the bond they got accepted. They insist in the most positive manner that they were deceived, and that they actually believed the security they offered was ample. The character of the president is vouched for under oath by many persons occupying high positions in public and private life, and they all say "they do not

believe he would knowingly countenance or in any way participate in or suffer an attempt to impose on the Supreme Court of the United States, or any justice thereof, a fraudulent or worthless bond;" but the fact still remains that he did present such a bond, and if he was ignorant of the wrong that was being done, the other agents of the company were not. Taking the whole case together, we think it quite as incumbent on us to refuse to accept a new bond as it is to set aside the old one.

The motion to vacate the *supersedeas* is granted.

3. As to dismissing the appeal.

The evidence shows that after the bond was accepted the president of the railroad company went with his own copyists to the office of the clerk of the Circuit Court, and in the absence of the principal clerk selected such of the papers and proofs used on the hearing below as he thought were necessary, and had them copied into the transcript. This being done, he caused a certificate to be added, signed in the name of the clerk by a deputy, and sealed with the seal of the court, to the effect that the transcript annexed contained copies of such entries, papers, and proofs as were "necessary on the hearing of the appeal prayed and allowed in the said cause." It is now alleged that many important papers and documents used on the hearing below, and necessary for the proper determination of the cause here, have been omitted from the transcript as filed.

While we desire to encourage in every proper way all attempts made in good faith to exclude immaterial matter from the transcripts brought here on appeals or writs of error, it will not do to permit the appellant or the plaintiff in error to make up a record to suit himself, without any regard to the wishes of his opponents or the rules and practice of the court. We therefore order, —

That the appellees file with the clerk of this court, and with the counsel for the appellant, on or before the first day of February next, a statement of the papers, documents, and proofs used on the hearing below, and omitted in the transcript now on file, which they deem necessary for the proper presentation of the cause, and that unless the appellant shall, on or before the fifteenth day of March, file in this court as part of

the record copies of such papers, duly certified by the clerk of the Circuit Court or his deputy, under the seal of the court, this appeal be dismissed.

If in this way unnecessary papers are brought up, we will, on application, make such order in respect to costs as may under the circumstances be proper.