## RAILROAD COMPANIES *v.* SCHUTTE.

FLORIDA CENTRAL RAILROAD COMPANY *v.* SCHUTTE; JACK-
SONVILLE, PENSACOLA, AND MOBILE RAILROAD COMPANY
*v.* SCHUTTE; WESTERN NORTH CAROLINA RAILROAD
COMPANY *v.* DREW.

1. The circumstances stated under which bonds of Florida, payable to bearer, issued in aid of certain railroad companies, signed by her governor and her treasurer, and sealed with her seal, were sold by the active efforts of the governor and came into the hands of subjects of Holland. Most of the sales were in that country. *Held*, that inasmuch as the bonds, though fraudulent in their inception, were put upon the market and sold in a foreign country to a people largely unacquainted with the English language, a case is presented which justifies the court in treating the owners of them as purchasers for value and in good faith, and entitled to relief accordingly.

2. One S., having money in his hands belonging to a corporation, W., fraudulently diverted it from the use to which the company had appropriated it, and purchased therewith bonds of the P. & G. and of the T. railroads. S. subsequently handed over the bonds to D. and others, purchasers of the railroads from the trustees of the State internal improvement fund, that D and his associates might use them in payment, it being the understanding that they were to raise money by mortgage and pay S. what he had advanced on the bonds, with commissions and fees in addition; and S., besides taking stock in the new company to be formed, was to have certain privileges in the election of directors. D. and his associates not being able to raise the balance of the purchase-money remaining after applying the bonds, S., by giving to the trustees a fraudulent check, got possession of the title-deeds, and caused them to be recorded. Thereupon D., for himself and his associates, executed a paper, purporting to convey the railroads to S., "in trust for the express purpose of enabling said S. — which he hereby agrees and binds himself to do — to convey the same to that incorporation, consisting or to consist as incorporators of said D. and his associates," as soon as the latter should be incorporated as a railroad company by the legislature. The legislature incorporated D. and his associates, and the company at once, without objection from S. or any one in his interest, took possession of the property and operated the railroad as owner. One L., who had succeeded to S. under his contracts, assumed control of the company, and was its principal stockholder. A new railroad company was then incorporated, which absorbed the other and took possession of its property. Both S. and L. were named as incorporators of the new company. The corporation W., whose funds S. had thus embezzled and invested, averred in its bill that the ownership of the property was in it. Through its agents it had also entered into a contract of settlement with S. and L., stipulating that the money it had lost should be paid to it from the proceeds of the

sales of certain State bonds to be issued to the railroad company on the faith of the ownership of this property. *Held*, that the corporation W. was estopped from setting up title to the property as against *bona fide* holders of the bonds.

3. The legislation under which certain bonds were issued by the State of Florida in aid of railroads having been pronounced unconstitutional by the Supreme Court of that State, this court passes upon the liability of the railroad company as guarantors of such bonds, — the case upon the facts being within the rule of the liability of an indorser of commercial paper.

4. Contracts created by, or entered into under, the authority of statutes are to be interpreted according to the language used in each particular case to express the obligation assumed.

5. The State, by the terms of the statute, having a lien on the property of the railroad company as trustee for the holders of the bonds, it does not follow, because the provisions of the statute in respect to the execution and exchange of the State bonds is unconstitutional, that the statutory lien is void also. The unconstitutional part of the statute may in this instance be stricken out, and the statutory mortgage left in full force.

6. A suit was brought by the State of Florida against the F. C. Railroad Company, alleging default in the payment of interest due on the company's bonds given in exchange for State bonds, and seeking to enforce the statutory lien by the sale of the roads and the application of the proceeds to the holders of the State bonds. The company answered, setting up fraud, the unconstitutionality of the law touching the State bonds, and averring that the railroad bonds were not a lien. The Supreme Court of the State dismissed the bill because it was not proved that any of the State bonds were in the hands of *bona fide* holders. The point as to the statutory authority, however, to exchange the bonds and create a lien, was directly made by the pleadings, and, after full argument, elaborately considered by the court. *Held*, that the decision on this point was in no just sense *obiter*.

7. It cannot be said that a case is not authority on one point, because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter.

APPEALS from the Circuit Court of the United States for the Northern District of Florida.

The facts are stated in the opinion of the court.

*Mr. George F. Edmunds*, *Mr. William A. Maury*, *Mr. Samuel F. Phillips*, and *Mr. James M. Baker* for the Florida Central Railroad Company.

*Mr. James M. Baker* and *Mr. James Baker* for the Jacksonville, Pensacola, and Mobile Railroad Company.

*Mr. George F. Edmunds*, *Mr. Samuel F. Phillips*, and *Mr. Joseph B. Stewart* for the Western North Carolina Railroad Company.

*Mr. Matthew H. Carpenter* and *Mr. Wayne MacVeagh*, *contra*.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

These cases, although separate in form, are so connected in their facts that they may properly be considered and decided together. The facts are these: —

The Florida, Atlantic, and Gulf Central Railroad Company, incorporated by the General Assembly of Florida in 1853, built a railroad from Jacksonville to Lake City. The Pensacola and Georgia Railroad Company, also incorporated during the same year, built a road from Lake City through Tallahassee to Quincy in the direction of Mobile, with a branch to Monticello; and the Tallahassee Railroad Company, incorporated at a somewhat earlier date, built another road from Tallahassee to St. Marks. Each of these companies became indebted to the State of Florida under the provisions of the internal improvement law, and, as a consequence, the road of the Florida, Atlantic, and Gulf Central company was sold, on the 4th of March, 1868, by the trustees of the internal improvement fund, under the authority of law, to William E. Jackson and his associates, that of the Pensacola and Georgia company, on the 6th of February, 1869, to F. Dibble and his associates, and that of the Tallahassee company on the same day and to the same parties.

The road from Jacksonville to Lake City was paid for in full, and a conveyance in due form executed to the purchasers, who, on the 29th of July, 1868, were, under the name of the Florida Central Railroad Company, incorporated by the General Assembly of the State, with all the powers and franchises of the Florida, Atlantic, and Gulf Central company. They were also authorized to fix the amount of the capital stock of the company, and the number of shares into which it should be divided. In this way the capital was put at $550,000, with five thousand five hundred shares. Of these shares George W. Swepson afterwards became the purchaser of four thousand three hundred and seventy, which he paid for with money in his hands belonging to the Western Division of the Western North Carolina Railroad Company, a North Carolina corporation, which he fraudulently diverted from the use to which it had been appropriated by that company.

Swepson also purchased, with the funds of the same North Carolina corporation, bonds of the Pensacola and Georgia and the Tallahassee companies to the amount of $960,000, or thereabouts, and on the 24th of April, 1869, he entered into a contract with the purchasers of the roads of those companies by which he was to deliver them these bonds to use in making their payments of purchase-money; and they, as soon as they could get the necessary authority from the legislature, were to raise money by a mortgage on the property and pay him what he had advanced to buy the bonds, with certain commissions and attorney's fees, and $100,000 in addition. The contract contemplated an incorporation of the purchasers after the manner of the Florida Central company, with a distribution of one-third of the stock to Swepson. As security for the payment of the sum agreed to be paid, the bonds issued under the contemplated mortgage were to be disposed of in a particular way, and Swepson was to be given certain privileges in the election of directors. Under this arrangement Swepson handed over $960,300 of Pensacola and Georgia and Tallahassee bonds to the purchasers; but after these bonds had been applied in the way contemplated there still remained a balance of the purchase-money, amounting to $472,065, to be paid. Deeds conveying the property to Dibble for himself and his associates were executed in due form, but their delivery was withheld on account of this default in payment. Dibble and his associates being unable to raise the money, Swepson, by putting off on the trustees of the improvement fund a worthless check that was never paid for the amount that was due, got possession of the deeds and had them duly recorded April 22, 1869. On the same day Dibble, for himself and his associates, party of the first part, executed a paper which on its face purported to convey the roads to Swepson, "said party of the second part, in trust for the express purpose of enabling said party of the second part — which he hereby agrees and binds himself to do — to convey the same to that incorporation, consisting or to consist as incorporators of said F. Dibble and his associates, as soon as said Dibble and his associates shall have granted to them such a similar relief as the legislature of the said State of Florida granted to William E. Jackson and his associates by act

for relief of William E. Jackson and his associates, approved July 29, 1868, and also for the further purpose of securing said party of the second part in all advances made as specified and agreed upon in the said agreement between these parties, executed and dated March 26, 1869, and the advancement, as aforesaid, of said sum of four hundred and seventy-two thousand and sixty-five dollars, until such time as said relief shall have been granted and said party of the second part shall have conveyed said property to said incorporation, as hereinbefore prescribed."

This instrument was never acknowledged or recorded.

On the 24th of June, 1869, the proposed act of incorporation was obtained, by which Dibble and his associates, as purchasers of the roads, were made a body corporate under the name of the Tallahassee Railroad Company, to hold, operate, and enjoy the property purchased, with all the powers, privileges, and franchises of the Pensacola and Georgia and the original Tallahassee companies, and with power to issue bonds secured by mortgage ; " *Provided*, that any deed of trust, mortgage, or conveyance, bond or bonds, or security which may have been executed, made, created, or contracted for, as a lien on said railroad or otherwise, by said Franklin Dibble, in behalf of himself and his associates, prior to the passage of this act, shall be valid and effectual to all intents, either at law or in equity, as a lien or a mortgage, or security on said railroad, as if the same had been made by virtue of this act, and shall in nowise be affected by any provisions thereof." Sect. 6.

The new Tallahassee company was duly organized under this charter, and took possession of and operated the roads. Afterwards, to remove all doubts as to the title of the corporation to the property of the old companies, Dibble, for himself and his associates, at some time during the year 1870, executed a paper which purported to be a conveyance, in due form, for that purpose, by which he professed to relinquish and quit-claim to the corporation all his rights. This paper was not acknowledged, and was not in fact a legal conveyance of the property. No conveyance in form was ever executed by Swepson, neither has he at any time, so far as appears, attempted to exercise any rights under the conveyance or transfer which was made to him.

On the 24th of June, 1869, an act was passed by the General Assembly of Florida to "perfect the public works of the State." By this act, "in order to secure the speedy completion, equipment, and maintenance of a connection by railroad between Jacksonville, on the Atlantic coast, and Pensacola, on the Gulf coast, and Mobile, in Alabama," George W. Swepson, Milton S. Littlefield, J. P. Sanderson, J. L. Re Qua, William H. Hunt, their associates, successors, and assigns, were constituted a body politic and corporate under the name of the Jacksonville, Pensacola, and Mobile Railroad Company. This company was authorized to build a railroad from Quincy to the Alabama State line, and there connect with any road running to Mobile, and to consolidate with the several companies owning roads from Quincy to Jacksonville, from Tallahassee to St. Marks, and the branch to Monticello. The original charter was somewhat amended on the 28th of January, 1870, after which sects. 9, 10, 11 of the original charter, and sect. 4 of the amended charter, were as follows:—

"SECT. 9. In order to aid the said Jacksonville, Pensacola, and Mobile Railroad Company to complete, equip, and maintain its road, and to aid in perfecting one of the public works embraced in the internal improvements of the State, the governor of the State is hereby directed to deliver to the president of the said company coupon bonds of the State to an amount equal to sixteen thousand dollars per mile for the whole line of road and length of railroad owned by or belonging to said Jacksonville, Pensacola, and Mobile Railroad Company, in exchange for first-mortgage bonds of said railroad company, of the denomination of one thousand dollars, when the president thereof shall certify upon his oath that the road or parts of road for which he asks for an exchange of bonds is completed, and is in good running order. The said bonds shall be of the denomination of one thousand dollars, signed by the governor, countersigned by the treasurer, sealed with the great seal of the State; shall bear eight per cent interest, payable semi-annually, and shall be payable to bearer. They shall be dated on the first day of January, A. D. 1870, and shall be due thirty years thereafter, and principal and interest shall be payable at such place in the city of New York as the governor shall designate. The coupons for interest shall be payable to bearer, and shall be authenticated by the written or engraved signature of the treasurer: *Provided,*

*however*, that when the Jacksonville, Pensacola, and Mobile Railroad Company shall or may determine to pay the interest in gold for or upon their bonds or the bonds designated in the tenth section of an act entitled 'An Act to perfect the public works of the State,' approved June 24, 1869, upon giving notice to the governor of such intention, then the State bonds aforesaid and the coupons for interest on said bonds shall be payable in gold, notice of which shall be given by the governor in some paper published in the city of New York, and at the capital of this State, to be designated by the governor.

"SECT. 10. In exchange for the bonds of the State above described, the president of the company shall deliver to the governor of the State coupon bonds of the company, bearing a like rate of interest, payable to the State of Florida, signed by the president, sealed with the corporate seal; coupons payable to State of Florida, authenticated by the written or engraved signature of the president. The bonds shall be of such denominations, not less than one thousand dollars, as the said company may choose, and principal and interest shall be payable at the same time and place as the aforesaid State bonds.

"SECT. 11. To secure the principal and interest of the said company bonds, the State of Florida shall, by this act, have a statutory lien, which shall be valid to all intents and purposes as a first mortgage duly registered, on the part of the road for which the State bonds were delivered, and on all the property of the company, real and personal, appertaining to that part of the line which it may now have or may hereafter acquire, together with all the rights, franchises, and powers thereto belonging, and in case of a failure of the company to pay either principal or interest of its bonds or any part thereof for twelve months after the same shall become due, it shall be lawful for the governor to enter upon and take possession of said property and franchises, and sell the same at public auction, after having first given ninety days' notice by public advertisement in at least one newspaper published in each of the following places : the city of New York, in the State of New York, the city of Savannah, in the State of Georgia, and the city of Tallahassee, in the State of Florida, for lawful money of the United States, and for nothing else, except that the State, for its own protection, may become the purchaser at said sale, and may pay on said purchase any evidences of indebtedness the State may hold against said roads, which purchase-money or said evidences of indebtedness shall be paid on the day of sale into the treasury of

this State, or within ten days thereafter; and all moneys arising from said sale and paid into the treasury of this State, as heretofore prescribed, shall be promptly and exclusively applied to the payment and satisfaction of the bonds issued by the State of Florida, under this act, and in case the holders of said bonds do not present them for redemption within ninety days after said sale, the treasurer shall invest the same, or any part thereof which may be remaining in his hands, in the securities of the United States, to be held by the State of Florida, as trustee for the bondholders, until said bondholders shall demand the same, upon which demand the treasurer shall immediately turn over or pay said securities to the bondholders. The purchaser or purchasers of said road shall be by said sale possessed of all the rights, privileges, and franchises of said defaulting company, together with the franchise of use and being a body politic, and the governor shall, upon the payment of said purchase-money into the treasury of this State, as above provided, immediately cause the purchaser or purchasers of said road at said sale to be placed in the actual possession, use, and enjoyment thereof, and cause all the books, papers, and real and personal property of said company, of every description, together with its franchise of use and being a body politic and corporate, to be turned over to said purchaser or purchasers, and the purchaser or purchasers of said road shall be by said sale possessed of all the rights, privileges, and franchises of said defaulting company, together with the franchise of use and being a body politic and corporate, and may use any new corporate name they see fit, and make and use a new seal upon signifying their action in writing to the governor, and thereafter may exercise all the rights of a body corporate and privileges thereof, and of said defaulting company, under said new name, for the term of thirty-five years, to date from the time of purchase as aforesaid. That any such sale shall be ratified by the legislature before the same shall become effective."

"SECT. 4. That the governor shall, for the purpose of further aiding said Jacksonville, Pensacola, and Mobile Railroad Company in the speedy construction of its road, deliver to the president of said company coupon bonds of this State, of the same character as those above described in this act, to the amount of sixteen thousand dollars per mile, upon receiving for and from the president of said company first-mortgage bonds of like amount on any part or portion of the road between Quincy and Jacksonville: *Provided, however*, the State bonds under this section shall not be exchanged for first-mortgage bonds for a greater length than one hundred miles

of any part of railroad between Quincy and Jacksonville : *Provided*, the said railroad company or companies .shall not issue first mortgage bonds to a greater amount than sixteen thousand dollars per mile."

Under the authority of this act the new Tallahassee company was consolidated with the Jacksonville, Pensacola, and Mobile company, May 25, 1870, by the name and having the corporate powers of the Jacksonville, Pensacola, and Mobile Railroad Company, with a capital of $6,000,000, divided into 60,000 shares. Previous to this time M. S. Littlefield had succeeded to all the rights of Swepson in these several transactions, and in the distribution of stock in the consolidated company he was given 38,433 shares of the agreed capital. He represented 9,930 out of the 10,000 shares at the meeting of the stockholders of the Jacksonville, Pensacola, and Mobile company which voted for the consolidation, and 17,998 of the 30,000 shares of the Tallahassee company voting to the same effect. The Florida Central company never entered into the consolidation, and the consolidated company, therefore, only became the owner of the roads west of Lake City.

After the consolidation was perfected the Jacksonville, Pensacola, and Mobile company executed its bonds, payable to the State for $3,000,000, as allowed by sect. 10 of its charter, and received in exchange bonds of the State for the same amount, such as were provided for in sect. 9, and in the following form : —

.**" UNITED STATES OF AMERICA.**

" No.  .]              *State of Florida.*              [No.

" It is hereby certified that the State of Florida justly owes to
          or bearer, one thousand dollars, redeemable in gold coin of the United States, at the Florida State agency, in the city of New York, on the first day of January, 1900, with interest thereon at the rate of eight per. centum per annum, payable half-yearly at the said Florida State agency, in gold, on the first days of July and January in each year, from the date of this bond and until the principal be paid, on surrendering the proper coupons hereto annexed.

" Tallahassee, January 1st, 1870.        HARRISON REED, *Governor.*
" [FLORIDA GREAT SEAL.]        S. B. CONNER, *Treasurer.*

"Issued in accordance with act of the legislature of Florida, approved January 28th, 1870.

## "*Form of Coupon.*

"The State of Florida will pay to bearer forty dollars in gold, at the State agency, in the city of New York, for interest due on bond for $1,000.

"No.                          S. B. CONNER, *Treasurer.*

### "*Indorsement.*

### "STATE OF FLORIDA.

"No.  .]    THIRTY-YEAR EIGHT PER CENT BOND.    [$1,000.

"Payable January 1st, 1900.  Interest payable 1st July and January, in gold, at Florida State agency, in the city of New York.

"This bond is one of a series issued in aid of the Jacksonville, Pensacola, and Mobile Railroad Company, to the extent of $16,000 per mile upon completed road.  The State of Florida holding the first-mortgage bonds of said railroad company for a like amount, as further security to the holder hereof.

"HARRISON REED, *Governor of Florida.*"

These bonds of the State, thus indorsed, were put in the hands of Littlefield, the president of the company, to be disposed of, and he, under an arrangement previously made with S. W. Hopkins & Co., of New York and London, handed the bonds over to them for sale.

Some time in the spring of 1870 Littlefield, who was at the time president of the Jacksonville, Pensacola, and Mobile company, and a director in the Florida Central, caused a million of dollars of the bonds of the last-named company to be printed in New York, and signed there by one H. H. Thompson as treasurer of the company.  These bonds were made payable to the State, and purported to be executed under the authority of the act of Jan. 28, 1870, to amend the act of June 24, 1869, "to perfect the public works of the State," and given in exchange for bonds of the State to aid the Jacksonville, Pensacola, and Mobile company.  After having been signed by Thompson, they were taken by Littlefield to Washington, where they were signed by Swepson as president of the company.  Afterwards the seal of the company was put to them, but undoubt-

edly in an irregular and surreptitious way. It is apparent, also, from the evidence, that when Thompson signed the bonds as treasurer he had not been formally elected to that office by the directors, but at a meeting of the directors, on the 25th of May, Littlefield stated that Swepson, the late president, had appointed Thompson as secretary and treasurer of the company for the past year, and on his motion this action of the president was approved.

On the 30th of May, 1870, an agreement was entered into between Littlefield and one Edward Houstoun, both stockholders of the Florida Central company, by which this million of dollars of bonds was put in the hands of Houstoun as collateral security for a debt from Littlefield to him, and on the 2d of June, at a meeting of the stockholders of the company, the following resolutions were unanimously adopted:—

" *Resolved*, that bonds to the extent of sixteen thousand dollars per mile be issued by this company, which bonds shall be a first lien or mortgage on the Florida Central railroad, its equipments, franchise, road-bed, workshops, and depots, excepting, however, the town-lots in the city of Jacksonville not used for depot purposes.

" And whereas the late president, George W. Swepson, caused to be prepared bonds to be issued by this company preparatory to an order of the board of directors to that effect, and which bonds were signed by said Swepson as president of this company and countersigned by H. H. Thompson, treasurer :

" *Be it therefore resolved*, that the said bonds so signed by said Swepson and countersigned by said Thompson, to the extent of sixteen thousand dollars a mile, be and they are hereby adopted as the bonds to be issued under the foregoing resolution, and that such bonds when so issued shall be a first lien or mortgage on the said Florida Central railroad, its equipment, franchise, road-bed, workshops, and depots (excepting the lots in Jacksonville not used for depot purposes).

" *Be it further resolved*, that said bonds shall be placed in the hands of Edward Houstoun for the purposes agreed upon by an arrangement between himself and Milton S. Littlefield, who is the owner of nearly all the stock in this company, which bonds or their proceeds are to be held and applied according to the terms of said arrangement, except the proportion thereof applicable or apportionable to the stock owned by other parties and upon the satisfac-

tion otherwise of the terms of said arrangement with said Houstoun, the said bonds are to be by him transferred to Milton S. Littlefield, or according to his direction, to the extent of the stock owned by him at the time.

"*Resolved further*, that the directors be directed to carry the foregoing resolutions into effect."

On the 7th of June, after these resolutions were passed, the original agreement between Littlefield and Houstoun was modified so as to provide for a substitution and exchange of the bonds of the State for the bonds of the company, and a sale of the bonds of the State by Hopkins & Co., they to pay from the proceeds certain sums to different parties, and the remainder, if any, to Littlefield. So far as appears nothing was to go to the Jacksonville, Pensacola, and Mobile company.

Afterwards, on the 21st of November, 1870, at a meeting of the directors of the company, a report was received from a committee appointed to take into consideration the past issue of bonds, as follows: —

"The committee finding that the bonds signed by G. W. Swepson, president, and countersigned by H. H. Thompson, treasurer, are in such form as that they cannot be used to carry out the intention of their issue when they were adopted, report the following resolution in respect thereto:

"*Resolved*, that the resolution adopting the bonds to be issued by the company, signed by George W. Swepson, president, and H. H. Thompson, treasurer, at a meeting of the board of directors, held on the 2d of June, A.D. 1870, be and the same is hereby rescinded, and that said bonds be destroyed."

The resolution as reported was unanimously adopted, but the bonds were never destroyed, and Houstoun, on the 11th of January, 1871, delivered them upon certain trusts to Coddington, who exchanged them for State bonds, which he took to New York, and afterwards, on the 18th of April, placed in the hands of Hopkins & Co. in New York for sale. On the 13th of April, 1871, at a meeting of the stockholders of the company, the following resolution was passed: —

"*Resolved*, that Edward Houstoun is authorized to place the bonds referred to in the preamble and resolutions of the stockholders, adopted June 2, 1870, in the hands of S. W. Hopkins &

Co., for the purposes mentioned in said resolutions, subject to the same exceptions therein expressed with respect to the proportion thereof applicable to the stock owned by other parties, and according to the same terms therein mentioned."

These State bonds were in the same form as those exchanged with the Jacksonville, Pensacola, and Mobile company, and they had upon them similar indorsements.

On the 24th of March, 1870, J. L. Henry, N. W. Woodfin, W. P. Welch, W. G. Candler, and W. W. Rollins were appointed by the General Assembly of North Carolina a commission "to examine and fully investigate the condition and affairs of the Western Division North Carolina Railroad Company, as far as it concerns the administration of G. W. Swepson, late president thereof, and to make a full and final settlement of all accounts and liabilities of said president, G. W. Swepson, in connection with said company," and this commission, on the 16th of April, 1870, entered into the following agreement : —

"Memorandum of agreement and settlement between the Florida Central Railroad Company, George W. Swepson, president, and the Jacksonville, Pensacola, and Mobile Railroad Company, Milton S. Littlefield, president, and Milton S. Littlefield, majority owner of the stock of said companies, and also of the stock of the Tallahassee Railroad Company, of the first part, and the Western Division of the Western North Carolina Railroad Company, represented by N. W. Woodfin, W. G. Candler, W. Pink Welch, and W. W. Rollins, commissioners appointed by an act of the legislature of North Carolina, approved by the stockholders of said corporation, of the second part, witnesseth :

"That whereas, George W. Swepson, late president of the Western Division of the Western North Carolina Railroad Company, made certain investments of the funds of said company in securities of and interests in the said Florida Central railroad, Jacksonville, Pensacola, and Mobile railroad, and the Tallahassee railroad, of the said State of Florida, as per report made by the said George W. Swepson to the said commissioners, amounting in the aggregate to the sum of one million two hundred and eighty-seven thousand four hundred and thirty-six dollars and three cents, to bear interest from the first day of November, 1869, at the rate of eight per cent per annum; and whereas the said George W. Swepson heretofore conveyed to the said Milton S. Littlefield, subject to the payment

of the above-recited claim, his interest in the above-recited rail-roads ; and whereas the said Littlefield has received authority from the legislature of the State of Florida and the several railroad companies to receive bonds to be issued by and for account of the several railroad companies, which bonds are to be exchanged for the bonds of the State of Florida to be issued for the purpose of aiding the finances of the said several railroad companies, all of which bonds are now in a state of preparation ; and whereas the said Milton S. Littlefield has made a contract with S. W. Hopkins and Co., No. 71 Broadway, for the disposition of said bonds as the same may be issued, the proceeds of the issue of the bonds of the Florida Central Railroad Company of the said State of Florida, amounting to nine hundred and sixty thousand dollars, are to be applied to the payment of the existing liabilities of the said several railroad companies, including the sum of one hundred and fifty thousand dollars to be paid to the commissioners aforesaid, for the purpose of paying existing liabilities of the said Western Division of the Western North Carolina Railroad Company.

"It is understood and agreed by the parties of the first and second part that the proceeds of the sale of the said bonds, so to be issued by the said Florida railroad companies and the said State of Florida, are to be equally divided, dollar for dollar, between the Western Division of the Western North Carolina Railroad Company and the said Florida railroads, and as the commissioners aforesaid receive by this first sale of bonds only the sum of one hundred and fifty thousand dollars, it is further understood and agreed that out of the proceeds of the sale of the issue of the bonds of the Jacksonville, Pensacola, and Mobile Railroad there is first to be received by the commissioners aforesaid a sum sufficient to be equal to the amount received by and on account of the said Florida railroads, and then an equal amount is to be received by the said commissioners and the said Florida railroads, dollar for dollar, until the entire amount of one million two hundred and eighty-seven thousand and thirty-six dollars and three cents, with interest at eight per cent, as aforesaid, being the sum reported by the parties of the first part as due to the Western Division of the Western North Carolina Railroad, is fully paid.

"It is further understood and agreed by the parties of the first and second parts, that all the interest owned or claimed by the said parties of the first part, George W. Swepson and Milton S. Littlefield, or which they as individuals have a right to control, in the said Florida railroads, are hereby pledged for the faithful fulfilment of

this contract without the right on the part of any party to interfere with our management or control of the affairs of the road.

(Signed)          " GEORGE W. SWEPSON,

*Pres't Fla. Cent. R. R. Co.*

M. S. LITTLEFIELD,

M. S. LITTLEFIELD,

*Pres. J. P. & M. R. R. Co.*

N. W. WOODFIN,

W. W. ROLLINS,

W. G. CANDLER,

W. P. WELCH,

*Commissioners.*

"Witnesses : M. W. RANSOM.

R. R. SWEPSON."

While these different proceedings were going on, and for a very considerable time afterwards, strenuous efforts were made by some parties interested to prevent a sale of the bonds of the State which had thus been put out. Notices of the fraud were extensively published both in this country and in Europe. Letters were written to those engaged in putting the bonds on the market, and suits were begun ; but notwithstanding all this we are entirely satisfied from the evidence that twenty-eight hundred, or thereabouts, of bonds given in exchange for those of the Jacksonville, Pensacola, and Mobile company, and two hundred and six given for those of the Florida Central company, were actually sold and are now owned by *bona fide* purchasers, most or all of whom are citizens of Holland. We have reached this conclusion without the aid of the depositions taken in Amsterdam, which were excluded in the court below. There cannot be a doubt that the governor of Florida was active in promoting the sale, as was also, to some extent, the chairman of the commission appointed by the General Assembly of North Carolina. The bonds were taken at once to London, and from there put on the market in Holland, where most or all of the sales appear to have been made. The bonds were undoubtedly steeped in fraud at their inception, but they were nevertheless apparently State bonds on the market in a foreign country, among a people largely unacquainted with the English language, and offering tempting inducements by reason of their liberal interest to those who were seeking

investments. To promote their sale those interested in the scheme kept a part of the proceeds to meet the interest for a time as it matured. Under these circumstances it is easy to see how, in the course of two or three years, with the help of skilful managers, the amount now out would be found in the hands of persons who believed they were holding a good and safe investment. At any rate, upon the facts as they are presented to us, we must hold that in this suit the present owners of the bonds occupy the position of purchasers for value and in good faith and are entitled to relief accordingly.

In March, 1872, the trustees of the internal improvement fund of Florida commenced a suit in Duval Circuit Court, Florida, against the Jacksonville, Pensacola, and Mobile company, to recover the balance that was due upon the purchase of the Pensacola and Georgia and Tallahassee roads, for which the fraudulent check was given by Swepson, and to enforce an equitable lien they claimed to have on the property as security for the payment. After this suit was begun Daniel P. Holland recovered a judgment against the company and levied upon and sold its railroad under execution, he himself becoming the purchaser and getting into possession. He thereupon was made a party to the suit of the trustees, and in his answer claimed to be the owner of the road, free of all liens in favor of the trustees or of the State on account of the bonds exchanged for the company's bonds under the amended charter. At its January Term, 1876, the Supreme Court of the State decided in that case that the title which Holland took by his purchase was subject to the prior liens on the property, and that the bonds of the State were unconstitutional and void, but that the *bona fide* holders of the State bonds were entitled to the benefit of the statutory lien to secure the company bonds which were given in exchange for the State bonds. *Holland* v. *State of Florida*, 15 Fla. 455.

In March, 1872, the State of Florida instituted another suit in the Duval Circuit Court against the Florida Central Railroad Company and others, alleging a default in the payment of the interest due on the bonds of that company given in exchange for the bonds of the State, and seeking to enforce the statutory lien by sale and an application of the proceeds to the

holders of the bonds of the State. To this suit the company answered, setting up to some extent the frauds that are complained of in the present case, and further averring that the bonds of the State were unconstitutional and void and that the railroad bonds were not a lien. This suit also went to the Supreme Court of the State on appeal, and it was there decided, at the January Term, 1876, — 1, That the State bonds were unconstitutional; 2, that the Florida Central company was authorized by the act of Jan. 28, 1870, to issue the bonds held by the State, and that thereby a first lien was created on the road of the company in favor of the *bona fide* holders of the State bonds; 3, that there were no such circumstances connected with the issue, delivery, and exchange of the bonds as would excuse the company from their payment to *bona fide* holders; but, 4, that there was no proof in that case showing that any of the State bonds were actually so held. *State of Florida* v. *Florida Central Railroad Co.*, id. 690.

Afterwards, at the January Term, 1878, in the case of the *Trustees of the Improvement Fund* v. *Jacksonville, Pensacola, & Mobile Railroad Co.* (16 id. 708), the same court repeated its decision that the State bonds were unconstitutional and that the statutory lien was good in favor of *bona fide* holders. The court also in that case declared the lien of the trustees on the roads of that company, to be prior in right to all others, as security for the payment of the balance due on the sales under which the present company got title to its roads. The amount due, as found by the court below in its decree, is $661,845.55, as of April 2, 1874.

After some of these decisions, and on the 30th of December, 1876, the holders of the State bonds represented in the present suits, and having 2,751 of the Jacksonville, Pensacola, and Mobile issue, and 197 of the Florida Central, united, and, through a committee, applied to the governor of the State to seize and sell the roads under the statutory liens for their benefit. Complying with this request, the governor advertised the roads for sale, and thereupon the Western Division of the Western North Carolina Railroad Company filed two bills in the Circuit Court of the United States for the Northern District of Florida, one to enjoin the sale of the Florida Central

road, and the other that of the Jacksonville, Pensacola, and Mobile company.   A preliminary injunction having been granted and the sale stopped, J. Fred. Schutte and others, representing the State bondholders, filed their bill in the same court to obtain a decree for the sale of the roads to pay their bonds.   In all these cases pleadings were filed and testimony taken, but before any final hearing the General Assembly of North Carolina passed an act repealing all acts creating or continuing in existence the Western Division of the Western North Carolina company, and vesting in the Western North Carolina Railroad Company absolutely all its rights, credits, rights of action, and effects, with authority for the Western North Carolina company to prosecute, defend, and manage any or all suits pending in which the Western Division company was interested.   This having been suggested to the court below after the cases were called up for hearing, the suits instituted in the name of the Western Division company were revived in the name of the Western North Carolina company, and the parties to the suit of Schutte and others corrected so as to adapt that case to this change in circumstances.   A hearing was then had in all the suits, which resulted in decrees dismissing the bills of the Western North Carolina Railroad Company.   In the Schutte suit a first lien was declared in favor of the trustees of the internal improvement fund upon the road of the Jacksonville, Pensacola, and Mobile company as far west as Quincy, to secure the payment of $463,175.37, with interest at eight per cent from March 20, 1869, that being the amount of the original purchase-money of that road unpaid, and a second lien in favor of the complainants upon the entire road of that company, including a few miles built west of Quincy, to secure the amount of State bonds held by them, given in exchange for the bonds of the Jacksonville, Pensacola, and Mobile company, the principal of which was $2,751,000, and the accrued interest $1,655,001.60.   A first lien was declared on the road of the Florida Central company for $197,000 of principal, and $118,515.20 of interest, on account of bonds of the State given in exchange for the bonds of that company.   Further provision was made in the decree for the sale of the roads separately, and for the application of the proceeds to the payment of the several

sums so found to be due from each respectively, in the order of the priority of the liens.

From the decrees dismissing the bills of the Western North Carolina company that company appealed. From the decree in the Schutte case the Western North Carolina company, the Florida Central company, and the Jacksonville, Pensacola, and Mobile company were allowed an appeal. In perfecting their appeal the Western North Carolina company and the Florida Central company gave bonds which operated as a *supersedeas*. Before, however, either appeal was docketed here, a settlement was concluded between the Western North Carolina company and the bondholders, and pursuant to an understanding to that effect, the appeal of that company was docketed and dismissed in this court on the 13th of September, 1879, pursuant to the 28th Rule.

At the last term an application was made to set aside the *supersedeas* obtained on the bond of the Florida Central, because the approval of the bond was obtained by fraud and perjury. This motion was granted. *Railroad Company* v. *Sehutte*, 100 U. S. 644. After this, on application to this court in behalf of parties interested in the administration of the assets of the Western Division company, and upon a representation that the settlement which had been made by the Western North Carolina company was in fraud of their rights and without their consent, an order was made to the effect that the dismissal be set aside, and the cause reinstated, if the Western Division company filed with the clerk of this court by the first Monday in February a bond, such as was specially designated. This bond was given and approved on the second day of February, 1880, and in time.

Upon these facts, gathered, with the help of counsel, from the confused mass of papers brought here as the transcript of part of the record below, and filling nearly fifteen hundred printed pages, many questions have been presented and ably argued. We will first consider the special position which the Western North Carolina company, as the successor of the Western Division company, occupies. So far as the Florida Central is concerned, it is not claimed that the Western Division could have had any other rights than such as belong to a stockholder

holding a controlling interest in the stock of the corporation. Its moneys were wrongfully invested in that stock by an embezzler. Swepson, the embezzler, bought the stock as stock, and if the company whose money was embezzled adopts his purchase, the stock must be taken as he held it, and subject to such incumbrances as were put on it while in his hands. This is not seriously disputed.

As to the Jacksonville, Pensacola, and Mobile company, an attempt is made to reach the property of the company because of the trust deed or agreement executed by Dibble to Swepson, after the conveyances from the trustees of the internal improvement fund had been procured through Swepson's fraud. That instrument purported, however, to be in trust for Swepson to convey to the company to be created by an act incorporating the purchasers of the property as soon as the necessary legislation to that effect could be obtained. It was not executed in a form to pass title, and the security was only to continue under this plan until the contemplated corporation could be organized. When the act of incorporation was obtained, the company at once, without objection from Swepson, or any one in his interest, took possession of the property and operated the railroad as owner. Littlefield, who had succeeded to all of Swepson's rights under his several contracts, assumed the absolute control of the company and was its principal stockholder. Both Swepson and Littlefield were named as corporators of the Jacksonville, Pensacola, and Mobile company, incorporated on the same day with the purchasers, which shortly after, as no doubt was from the beginning intended, absorbed the purchasers' corporation and took possession of its property. No one ever disputed the title of the Jacksonville, Pensacola, and Mobile company until long after this litigation began, and the Western Division company in its original bill distinctly averred that the ownership of the property was in that company. Littlefield held a controlling interest in the stock, and that undoubtedly represented the proceeds of Swepson's embezzlements invested in the Pensacola and Georgia and Tallahassee bonds, through which the North Carolina company seeks to reach the property. This is clearly recognized in the contract of settlement entered into between Swepson, Littlefield, and the commissioners of

North Carolina, on the 16th of April, 1870, by which it was agreed that the North Carolina company should be paid the money it had lost from the proceeds of the sales of the state bonds to be issued to the Jacksonville, Pensacola, and Mobile company on the faith of its ownership of this very property. Certainly under such circumstances the North Carolina company is estopped from setting up title to the property as against the *bona fide* holders of these bonds. In this litigation that company can occupy no other position than that of an equitable owner of the stock of Littlefield in the Jacksonville, Pensacola, and Mobile company, and all incumbrances on the property are necessarily incumbrances on the stock which the property in legal effect represents. The settlement with Swepson was undoubtedly conditional, and not to be complete until the money agreed on was paid, but nevertheless the North Carolina company became by the transaction a seller of the bonds and is estopped accordingly.

This disposes also of the claim that the lien in favor of Swepson, created by the deed, or agreement, of trust to him, was saved by the proviso at the end of sect. 6 of the act incorporating the new Tallahassee company. It is apparent from the whole tenor of the instrument that this was not intended as a continuing security, and it is equally clear from the evidence that the stock standing in Littlefield's name represents all the interest which he or Swepson held in the property, as security or otherwise, when these suits were begun. In addition to this, as the instrument was imperfectly executed and was never recorded, it passed no title as against *bona fide* purchasers. The cases, then, in all their aspects are to be treated as they would be if the several companies were alone, each for itself, defending the claims made by the bondholders.

We proceed, then, to inquire whether the companies or either of them can successfully defend the Schutte suit. At the outset it will be conceded that the State bonds are unconstitutional. The Supreme Court of the State has three times so decided in cases where the question was directly presented by the pleadings, and apparently fully argued. In *State of Florida* v. *Anderson* (91 U. S. 667) we said this delicate question was "one it was eminently proper the courts of Florida

should determine," and while we are not now prepared to say that these decisions are conclusive on us, they certainly are not of such doubtful correctness as to make it proper that they should be disregarded. The conclusions were reached by applying the language of art. 12, sect. 7, of the Constitution of 1868, to the condition of affairs in the State when that Constitution was adopted. Such a question is peculiarly within the province of the courts of the State to decide, and we ought not to depart from what they have done, except for imperative reasons.

But it by no means follows that because the State is not liable on its bonds the companies are free from responsibility under their statutory mortgages. By the express provisions of the act the State bonds were to be given the company in exchange for its own bonds. The company, not the State, was to use and dispose of the State bonds. The object of the State was to aid the company with its credit. The State bonds were to be made payable to bearer, and negotiable, while the company bonds were to the State alone and not negotiable. The company bonds were to be coupon bonds payable at the same time and place as the State bonds, and, if the company paid its interest in gold, it was the duty of the State to pay in the same way. It is clear, therefore, the intention was that, as between the State and the company, the State was to be the guarantor of the company bonds, and the company the principal debtor. With the public, however, it was different. There the State was the debtor, and the company was only known through the statutes under which the bonds were put out, and the certificates indorsed on the bonds themselves, which were that the State held "the first-mortgage bonds of the railroad company for a like amount as security to the holder hereof." Such bonds of the State with such indorsements the company put on the market and sold. Under these circumstances the certificate of the governor as to the security held by the State is in legal effect the certificate of the company itself, and equivalent to an engagement on the part of the company that the bond, so far as the security is concerned, is the valid obligation of the State. The case is clearly within the reason of the rule which makes every indorser of commercial paper the

guarantor of the genuineness and validity of the instrument he indorses. We cannot doubt that under these circumstances the company is estopped, so far as its own liabilities are concerned, from denying the validity of the bonds. Having negotiated them on the faith of such a certificate, the company must be held to have agreed, as part of its own contract, whatever that was, that the bonds were obligatory.

What, then, were the engagements into which these several companies entered when, as is alleged, they accepted the bonds of the State in exchange for their own, and put them on the market for what they appeared on their face to be worth as commercial paper? And here it is proper to say that contracts created by, or entered into under, the authority of statutes, are to be interpreted according to the language used in each particular case to express the obligation assumed. Where the State is concerned the words employed are sometimes to be taken most strongly against the other party, but in this, as in other cases of contracts, language is to be given, if possible, its usual and ordinary meaning. The object is to find out from the words used what the parties intended to do. Every statute, like every contract, must be read by itself, and it no more follows that one statutory contract is like another than that one ordinary contract means what another does. Of course, general rules of construction may and should be called into use when required, and sometimes, when certain words used in statutes are understood to have a certain meaning, the same words will be given the same meaning in other like cases; still, in the end, it must be determined from the language used in each particular case what has been done, or agreed to be done, in that case. We have been thus careful to state these familiar principles in this connection to guard against the use of this case as authority in others where the contract, even though it be created by or under the authority of a statute, is not the same.

In the present case a statutory lien, in the nature of a first mortgage duly registered, was given the State on the property of the company to secure the principal and interest of the company bonds, with power in the governor, if default, for a certain length of time, should be made in the payment of principal

or interest, to take possession of, advertise, and sell the property for lawful money of the United States, and nothing else, unless the State, for its own protection, should become the purchaser, when the price might be paid in money or such obligations of the company as the State should hold. In case of a sale the purchase-money, as well as the evidences of the company's indebtedness taken as money, were to be paid into the State treasury, and promptly and exclusively applied to the payment and satisfaction of the bonds issued by the State under the authority of the act now in question. If the holders of the State bonds did not present them within ninety days after the sale, the treasurer was required to invest the money remaining in his hands in the securities of the United States, "to be held by the State of Florida as trustee for the bondholders," until demand of the payment of the bonds, when it was made the duty of the treasurer to turn over the securities to the bondholders. It would seem as though language could not be used indicating more clearly an intention to have the lien, what the governor when he made the exchange certified it to be, a security for the holder of the State bonds. It is quite true that, by sect. 13 of the act under which the Jacksonville, Pensacola, and Mobile company was organized, the company could, at any time before maturity, pay off its own bonds in national currency, or in bonds of the State; but that does not change the character of the trust created by sect. 11, in case no such payment was made. Here no payment of any kind has been made, and no foreclosure of the lien has been attempted by the State except in the interest of the bondholders. The State, from the beginning, has recognized its obligations as trustee, and, on the request of the bondholders, commenced the proceedings, under the authority of this statute, which have resulted in the present suits. Indeed, one of the decisions against the constitutionality of the bonds was rendered in a suit instituted by the State, apparently on its own motion, to enforce the lien on behalf of the bondholders. In our opinion there is no occasion for applying here the doctrines of subrogation, because, in unmistakable language, the statute has made the mortgage of the company security for the payment of the obligations of the State. This we understand to be in accordance with the opinion of the State

court, as expressed in the Holland and Florida Central cases, reported in the 15th and 16th of Florida Reports.

It is contended, however, that as the provision of the act in respect to the execution and exchange of the State bonds is unconstitutional, the one in relation to the statutory lien on the property of the company is void also, and must fall. We do not so understand the law. Undoubtedly a constitutional part of a statute may be so connected with that which is unconstitutional, as to make it impossible, if the unconstitutional part is stricken out, to give effect to what, taking the whole together, appears to have been the legislative will. In such a case the whole statute is void; but in this, as in every other case of statutory construction, all depends on the intention of the legislature, as shown by the general scope of the law. To our minds it is clear, in the present case, that the object of the legislature was, not to create a debt which the State was expected to pay, but to aid the company in borrowing money upon the credit of the State. As between the State and the company the debt for the money borrowed was to be the debt of the company. If the State paid its bonds from its own funds the mortgage could be enforced to compel the company to make the State good for all such payments. If the State did not pay, then the creditors had their own recourse upon the mortgage. The State credit, so far as the State and the company were concerned, was only to aid the company in borrowing money on its own bonds. In any event, the company was to be bound for the payment of the entire debt when it matured, and its property was to be given as security. Under these circumstances, it seems to us that the unconstitutional part of the statute may be stricken out and the obligation of the company, including its statutory mortgage in favor of the State bondholders, left in full force. The striking out is not necessarily by erasing words, but it may be by disregarding the unconstitutional provision, and reading the statute as if that provision was not there. These bonds, as State obligations, were void, but, as against the company which had actually put them out, they were good.

This disposes of this part of the case so far as the Jacksonville, Pensacola, and Mobile company is concerned. No claim

is made that the statute does not on its face authorize that company to exchange its bonds for those of the State, or that the lien is not created by the exchange. Neither is it claimed that the necessary corporate action was not had to get the bonds out under the forms of law. Although on the 10th of December, 1870, a resolution was passed by the directors of the company, ordering a recall of the bonds on account of the proposed misapplication of the proceeds of the sales to be made, an actual withdrawal was never effected, and the bonds have got into the hands of *bona fide* holders. The very resolutions which directed the recall asserted the previous lawful and regular issue.

As to the Florida Central company, however, the case is different, and it is claimed not only that the statute did not authorize the exchange of the bonds and the creation of the lien, but also that the company did not in its corporate character execute its own bonds or make the exchange.

As to the first question, we deem it sufficient to say that the Supreme Court of Florida has distinctly decided that in the case of this company, as well as the other, the statutory authority was complete. The point was directly made by the pleadings and as directly passed on by the court. Although the bill in the case was finally dismissed because it was not proved that any of the State bonds had been sold, the decision was in no just sense dictum. It cannot be said that a case is not authority on one point because, although that point was properly presented and decided in the regular course of the consideration of the cause, something else was found in the end which disposed of the whole matter. Here the precise question was properly presented, fully argued, and elaborately considered in the opinion. The decision on this question was as much a part of the judgment of the court as was that on any other of the several matters on which the case as a whole depended.

This, like the constitutionality of the act, is a question of local law. It depends on the peculiar condition of local affairs. If the decision is not conclusive on us, it is of high authority under the circumstances, and we are not inclined to disregard it. The holders of the commercial paper put out by the com-

pany and bought on the faith of the State are entitled to the benefit of every presumption in their favor.

The next important inquiry is whether the necessary authority for the issue and exchange of the bonds was given by the corporation itself. Certainly the resolution of June 2, 1870, is on its face sufficient for that purpose, as is also that of April 13, 1871. It is true Littlefield now swears that these meetings of the stockholders and directors were irregular and without sufficient notice, but it is worthy of remark that, in the resolution of November 21, rescinding that of June 2, there is no pretence that the original resolutions were not lawfully passed and binding on the company. The rescission is put entirely on the ground that the form of the bonds was not such as to carry out the intention of the company in directing their issue. Mr. L'Engle also, in his letter to Boissevain, giving notice of the frauds that had been practised on the company, substantially conceded that the issue of the bonds was authorized by the company, and confined his protest to the improper use that was being made of them. It is clear to our minds from the whole case that but for the fraudulent disposition of the bonds the corporate action of the company in putting them out would have been considered sufficient. Littlefield's character, as it appears all through this voluminous record, is not such as to entitle him to any favorable consideration as a witness or otherwise. He and Swepson have both shown themselves capable of the most shameless frauds, and we cannot but look with suspicion upon everything they do or say. We regret it is not in our power to relieve the corporations, whose affairs they have been permitted to manage, from the consequences of their wanton breaches of trust; but in our judgment this cannot be done without injuring those who are innocent of all wrong.

It is next contended, that as the bonds were fraudulently put out by the officers of the companies, and are unconstitutional, the recovery must be confined to the amount actually paid for the bonds to the agents of the companies. As we have endeavored to show, the bonds, although void as to the State, are valid as to the company that sold them. Having been put on the market by the companies as valid bonds, the companies are estopped from setting up their unconstitutionality. As against

the companies, they occupy in the market the position of com mercial securities, and may be dealt with and enforced as such. The companies, through their faithless agents, are in a position where they must meet those they have dealt with commercially, and respond accordingly. In commerce, commercial paper means what on its face it represents, regardless of what its maker or promoter may have got for it. The bonds of the State in the open market purported to be what they called for. The companies put them out, and in legal effect, as we think, indorsed them. A *bona fide* holder can now require the indorser to respond to his indorsement commercially; that is to say, by paying what he in effect agreed the maker must pay.

We believe we have now disposed of all the questions the record presents. It has been suggested that since the appeal the property has been sold under the decree below. That is not shown by the record. The *supersedeas* in favor of the Florida Central company we have decided was fraudulently obtained. The justice who accepted the bond was imposed upon. That *supersedeas* was promptly vacated when the facts were called to our attention. The *supersedeas* secured by the Western North Carolina company was, to say the least, suspended when that company voluntarily dismissed its appeal under the 28th Rule. This suspension was not vacated until the bond of indemnity was filed on the 2d of February, 1880. It will be for the court below to determine, when it is called on to confirm any sale that has been made, whether a sale was stayed by a valid subsisting *supersedeas*. From relief against any order in that behalf the parties must resort to such measures as they may be advised they are entitled to. We cannot, from anything now before us, settle any such question.

*Decrees affirmed.*

These cases were decided before MR. JUSTICE SWAYNE and MR. JUSTICE STRONG resigned.

MR. JUSTICE FIELD was not present at the argument of these causes, and took no part in deciding them.