## WINKLER VS. THE STATE.

1. **ARRESTS:** *Authority to make, etc.*

   A constable is a peace officer, and as such has authority to arrest offenders against the law; but he is not authorized to execute a warrant of arrest, or other process, directed to the sheriff, unless deputized in the manner provided by law.

2. **EVIDENCE:** *Admissibility.*

   Where a killing occurred in an attempt to arrest a party in company with the deceased, and there are circumstances in the case tending to show improper motives in the arresting party, evidence of bad feeling between them and the party whose arrest is sought, is admissible; but statements that the party sought to be arrested had kept out of the way for fear of being killed by one of the arresting party, drawn principally from the statement of the former, are hearsay and inadmissible.

3. **BILL OF EXCEPTIONS.**

   If statements and papers exhibited by counsel to the jury in the argument of a cause are objected to, they must be brought into the record by bill of exceptions; if they are incorporated in the motion for new trial and not in the bill of exceptions, the objection will not be considered.

4. **MANSLAUGHTER:** *Instruction.*

   An instruction to the jury upon a trial for manslaughter, as to the assessment of the punishment in case they should find the defendant guilty of manslaughter, should explain the two grades of that crime.

APPEAL from *Washington* Circuit Court.

Hon. J. M. PITTMAN, Circuit Judge.

*Gregg,* for appellant.

*Henderson, Attorney General, contra.*

TURNER, J.:

At the October Term, 1876, of the Washington Circuit Court, William J. Gilliland, Ephraim Ramey, William Perry, Louis Dansit, Enos Mills and John Winkler were indicted for the murder of William Jones.

At the October Term, 1877, of the Circuit Court, the State appeared by her attorney, and also the defendants in person and by attorney, and elected to sever and try the defendant John Winkler first, who was thereupon arraigned and tried upon the plea of not guilty, and found guilty of manslaughter, and his punishment assessed by the jury at two years in the State prison.

On the 6th day of November, at the same term of the court, the defendant filed his motion for a new trial, and on the 20th day of November following his motion in arrest of judgment. Both motions were overruled and the defendant took an appeal to this court.

The bill of exceptions sets forth fully the evidence in the cause, and the instructions asked for by the defendant and those given by the court.

The motion for a new trial assigns the following causes:

*First*—Because the verdict is contrary to the evidence.

*Second*—Because the verdict is against the law and evidence.

*Third*—Because the court erred in admitting illegal evidence over the objections of the defendant.

*Fourth*—Because the court erred in excluding legal evidence offered by the defendant.

*Fifth*—Because the court erred in refusing to give the first, second, third, fourth, fifth, sixth, eighth, ninth, tenth, eleventh,

twelfth, thirteenth, fourteenth, fifteenth, seventeenth, and eighteenth instructions asked for by the defendant, and overruling and refusing to give said several instructions.

*Sixth*—Because the court erred in giving the jury as law in this cause the tenth, eleventh, fourteenth, eighteenth, twentieth, twenty-first, twenty-second, twenty-third, twenty-fourth, twenty-ninth, thirty-second, and thirty-sixth instructions by the court declared and given to the jury.

*Seventh*—Because the jury found contrary to the instructions of the court.

*Eighth*—Because the jury were unduly influenced by acts and declarations of the prosecuting attorney, E. J. Stirman, Esq., in this, that after the close of the evidence in the cause, and while he was making an argument on the part of the State, he was allowed to, and did present to the jury a newspaper, in which the Governor's proclamation, offering a reward of $500 for the arrest of Newton Jones for murder, was published, and declared that its first publication was after the killing of William Jones and defendant could not have known of the proclamation at the time, and held up the paper and announced its date when no such fact had been given in evidence, and in his closing argument and after defendant's counsel had closed, announced as a fact to the jury that he could prove that the Governor had offered a reward for the arrest of the defendant, and hence he was as bad as Newton Jones, and he in his said speech took up the instructions prepared by the court and declared that every one of them was objected to by the defendant, and declared to the jury that the court had refused to give the defendant's instructions, and read to the jury as he said from the head of the instructions "All objected to by defendant," and said under the instructions given the defendant could not be acquitted, and further asserted, he was advised the defendant had witnesses here to prove he was not .

at the killing, if he had dismissed Mills, and argued that he had proved that Newton Jones kept out of the way of the officers only because he was afraid he would be waylaid and assassinated by defendant Gilliland, with other assertions unauthorized by law and evidence, and by the asserting of such facts to the jury when no such witnesses had been summoned, when a number of the instructions were those presented by the defendant and modified by the court, when no such reward had ever been offered, (for the defendant could not answer said assertions by proof or argument) he did create an undue prejudice on the part of the jury against this defendant and his cause, and as defendant believes, unjustly procured his conviction for manslaughter.

*Ninth*—Because the court erred in refusing to allow the defendant to read a legal definition, and to read any law whatever.

The evidence as set forth in the bill of exceptions shows that an indictment was pending in the Washington Circuit Court against one Newton Jones for the murder of Bud Gilliland some time in the year 1875. That Jones kept out of the way for some time after the commission of the alleged offense, but returned into the neighborhood a short time before the killing of William Jones. That soon after it was known that Newton Jones had returned to the neighborhood, a warrant was issued to the sheriff of Washington County for his apprehension, which warrant came to the hands of Enos Mills, constable of White River Township in said county, to be executed. The constable thereupon proceeded to summon the defendant and the said other defendants, to assist him in arresting said Jones, and for that purpose the constable and his posse concealed themselves in the woods about thirty yards from the road where Newton Jones was expected to pass and awaited his coming. It is further shown by evidence that the constable and his posse had been concealed

for some time in the bushes awaiting the coming up of Jones, and in the meantime had cut out to some extent the undergrowth from two places of concealment in the bushes to the road along which Jones was expected to pass, and that there was no announcement to him upon his coming up, by the constable or any of his posse, previous to the firing, that they had a warrant for his apprehension.

It is also further shown by the evidence that Newton Jones was a resolute man, and some of the witnesses stated he was a dangerous man, and had avowed a determination not to be arrested.

David Jones, a brother of the deceased, and a witness for the prosecution, details the circumstances of the killing as follows: "I know the deceased William Jones, Enoch Jones and Newton Jones. William Jones was killed by shot on the 15th October, 1876, in Washington County, in the State of Arkansas. I was present and saw him before he was shot and after his death on that day; Matilda, William, Enoch, Newton and myself were together. Matilda and I were riding in a wagon, and William Jones, and Enoch Jones, and Newton Jones were riding behind the wagon. We started from Lewis & Johnson's Mill (from Lewis' house) and we got about a half mile from Johnson's mill, on the road towards Carter's store. I was driving the wagon and Matilda was riding in the wagon. The others were riding behind. Newton and William were riding side by side. Enoch was riding behind them. The first thing I heard was the report of a gun or pistol. Immediately afterwards several guns were fired, and my mules ran off, ran about seventy-five yards. After my mules stopped, I raised up in the wagon and heard some one say halt! halt! shoot them boys, the last damned son of a bitch of them. I could see a glimpse of men running up the hill in the

woods. I heard horses running on the other side of the road. I un-hitched my mules and went back and found my brother dead, lying close by the side of the road, rather under his horse, which was down. Two shots in the head, and in the temple, several in side and leg. Deceased was armed, had his revolver under him, not drawn. There was a turning out of the road by horses before the first gun fired. I looked around at first fire and saw horses dashing off. I went over the ground and looked at it. There seemed two places where parties had been, one behind a log, and one near a hickory tree, seemed as if they had been there half a day. Brush tramped down. Brush trimmed out from log to road, and from tree to road. I stepped the distance and it was just thirty steps. When the firing began they were just opposite those places. Enoch was wounded in the side of the head and a shot glanced his neck. The voice I heard I thought was Jeff. Gilliland's. Heard but one voice; halt, was given but one time, that I heard. If it had been given before, I would have heard it."

Enos Mills, the constable, who attempted the arrest of Newton Jones, was examined as a witness, and after stating that he knew the deceased and all the other defendants who were present with him at the killing of William Jones, describes the circumstances of the killing as follows: "I went to a place where I thought I would stop them. I expected I would have to fight them, and I told the boys (them with me), to make them stand when I halted them. Everybody said they would fight. They came along and I halted them, three or four times, and they threw themselves down foward on their horses, and clapped their hands to their pistols and broke to the brush. I fired and the parties with me commenced firing. When we found out the wrong party was killed, I told them we had better get away, that they might come back and kill some of us.

Deceased was shot through mistake. This witness further states as follows: "At the time of the shooting I did not tell the party or Newton that I had a writ. I did not have time. The parties ran before I could do so. I summoned the defendant, when I showed the writ to him and he read it. I had the writ in my pocket at the time of the shooting. I did not produce it. They threw themselves down on their horses and grabbed their pistols. I first spoke to them. I had no time to make known that I had a warrant. I had the writ in my pocket at the time of the shooting and did not produce it.

It appeared in evidence, also, that the party along with Newton Jones at the time of the killing, was his wife Matilda Jones and other relations, and that Jeff Gilliland, one of the constable's posse, was the brother of Gus. Gilliland alleged to have been killed by Newton Jones.

A number of other witnesses were examined both for the prosecution and defense. But we deem it unnecessary to reproduce their statements in detail, for while there is some conflict among them as to minor matters, there is but little discrepancy as to the material facts of the case.

The defendant asked for instructions, numbering from one to eighteen inclusive, and the court of its own motion gave instructions numbering from one to thirty-eight inclusive.

The first question for our consideration is, did the court err in refusing to give the instructions asked for by the defendant embraced in the fifth cause assigned in his motion for a new trial; and this we will consider in connection with the further question, did the court err in giving the instructions embraced in the sixth cause assigned for a new trial.

The court refused to give all of the instructions asked for by the defendant except the sixteenth, which was given.

In referring to these instructions, we think the third, which is to the effect: "That a constable is a peace officer, or conservator of the peace, throughout the county and that it is his duty to arrest all offenders," was unexceptionable and might well have been given to the jury, and so of the seventh instruction, which is: "That the fact of the indictment having been found, charging Newton Jones with murder, would be reasonable grounds in the mind of any one knowing or having information of the same to believe that he had committed a felony."

The twelfth instruction, which was to the effect: "That a constable would have a right to serve a writ issued by the clerk of the Circuit Court of his county on an indictment pending in said court for murder, and on file in his office, if such writ should come to his hands for such purpose, was, without the statement of qualifying facts, calculated to mislead the jury and was properly refused.

In this connection we may consider the twentieth instruction given by the court, which is, in substance: That the "warrant itself would be no protection to an officer unless the same was directed to him, or delivered to him by the officer to whom it was directed, and that if the jury find in this instance that the warrant of arrest, under which Constable Mills purported to have acted, was neither addressed to him nor delivered to him by the officer to whom it was directed, his authority to make the arrest would not be given by the warrant, but if it was directed to him, or delivered to him by the officer to whom it was directed, he would have the authority to make the arrest under it, although the same may have been issued from the Circuit Court."

This instruction was, to some extent, subject to the same objection as the defendant's twelfth, because, as we think, founded

·on an erroneous conception of the sheriff's power to authorize another to execute a warrant directed to the sheriff.

The ordinary bench warrant embraced in sec. 1808, of Gantt's. Digest, is directed to any sheriff, coroner, jailor, constable, marshal or policeman in the State.

A warrant regularly issued, so directed, coming to the hands of any one of those officers can be executed by such officer. And if a warrant so directed come to hands of a duly qualified deputy of any one of these officers, who may by law be entitled to such deputy, he too will have authority to serve such warrant.

In this case the warrant was directed to the sheriff of Washington County; a duly qualified deputy could have executed the warrant, because he possesses all the powers of his principal.

But could the sheriff either directly or indirectly empower the constable of White River township to execute the warrant by simply delivering it to him without first appointing him a deputy in the manner required by law? We think not.

Chitty, in his work on Criminal Law, in discussing the subject of arrests, says: "With respect to the person who may execute the warrant, it seems that if it be directed to the sheriff he may authorize others to execute it, but that if it be given to an inferior officer he must personally put it in force, though any one may lawfully assist him, and if a warrant were generally directed to all constables, no one could act under it out of his own precinct, and if he did he would have been a trespasser, but if it were directed to a particular constable by name, he might execute it any where within the jurisdiction of the justice by whom it was granted." 1 Chitty's Crim. Law, 48.

Bishop, who quotes Chitty in referring to the power of the sheriff to authorize another to execute a warrant, adds "not verbally, however, for the deputy must be constituted such by a written instrument." 1 Bishop Crim. Pro., 646.

These writers follow Hale, Foster and Hawkins.

A constable then holding a warrant directed to the sheriff would not, from the fact of his being a constable simply, have the authority to execute the warrant. Before he could legally execute it, he must be appointed and constituted a deputy sheriff in the manner prescribed by law; so then it would follow that the constable, Mills, although holding the warrant, could not as such execute it, he having no legal authority from the sheriff to do so.

While then, the court's instruction may leave us in doubt as to the authority of the constable under the warrant, the instructions as a whole leave us in no doubt as to the power and duty of a constable to arrest a felon with or without a warrant, when it is done in good faith and for the purpose of bringing the offender to justice.

The remaining instructions asked for by the defendant were refused, and those prepared by the court given because, as we suppose, they were more pertinent, and appropriate, more full and comprehensive in their application of the law, to the facts disclosed in the evidence, than were those of the defendant. The objection to them is not well taken. They presented the law of the case fairly, and are even liberal towards the defendant, who we think is not prejudiced by the instructions given by the court, nor by the court's refusal to give any of those asked for by the defendant.

The third objection assigned as a cause for a new trial is the alleged admission of illegal evidence, on the trial.

The defendant asked a witness whether or not Jeff. Gilliland and Newton Jones were on good terms, to which witness answered and said that Gilliland and Jones were not on good terms, and the witness further stated that the feeling between Newton Jones, Jeff. Gilliland and Ephraim Ramsey was bad.

Witnesses were also permitted to state that Newton Jones kept out of the way and would not come in and surrender to be tried for killing Gus. Gilliland because he was afraid Jeff. Gilliland would kill him. To the admission of this evidence the defendant objected, but his objection was overruled.

There being facts and circumstances connected with this case, tending to show that the party attempting to arrest Jones may have been actuated by other motives than a desire to arrest and bring him to trial for killing Gus. Gilliland, we regard evidence going to show bad feeling between Jones and the arresting party entirely competent, and think it was properly admitted.

But as to statements going to show that the reason why Newton Jones kept out of the way and did not surrender himself to be tried for killing Gus. Gilliland was not so much because he was afraid to surrender and be tried, as he was afraid that if he did, Jeff. Gilliland would kill him, and this drawn principally from the declarations of Jones himself, was hearsay, and clearly inadmissible.

The fourth cause assigned for a new trial is that the court erred in excluding legal evidence offered by the defendant, this we think is unfounded, for we find that no legal evidence offered by the defendant was excluded from the jury.

The seventh cause assigned for a new trial is, that the jury found contrary to the instructions of the court.

This we think is insufficient. True, the instructions of the court might have been more full and complete in its definitions of different grades of homicide, and particularly the distinction between voluntary and involuntary manslaughter, should have been clearly stated to the jury. But notwithstanding this omission, the finding of the jury was in accordance with the instructions.

The eighth cause assigned for a new trial is: Because the jury were unduly influenced by acts and declarations of the Prosecuting Attorney, E. J. Stirman, Esq., etc., going on with specifications of the actings and doings of the said prosecuting attorney in his closing argument to the jury.

This, if it were good cause for a new trial, is not properly before us for review. The facts which it discloses were not made a part of the bill of exceptions at the trial, and appear for the first time in the motion for a new trial.

The motion for a new trial is not a part of the bill of exceptions, and a party cannot put what purports to be evidence in the cause, on record, by incorporating it into the motion for a new trial, not even by referring to it as incorporated in the bill of exceptions. *Berry* v. *Singer*, 10 Ark., 483.

We are, therefore, not called upon to express any opinion as to the sufficiency of this cause for a new trial.

The ninth cause assigned for a new trial is: Because the court erred in refusing to allow the defendant to read a legal definition, and to read any law whatever.

This presents for our consideration, the question: Did the court err in denying to the defendant, the right to read law which he considered applicable to his case?

We understand the uniform practice of the English and of the American courts, both State and Federal, including those of Arkansas, is to permit attorneys under the direction of the court to read the law applicable to the case on trial, with such comments and explanations as he may deem appropriate.

This is the first time the question has ever been presented for our consideration, and the fact that we have not been able to find any adjudicated cases bearing on the question, notwithstanding the prevailing practice in our courts, would seem to indicate that occasions have not often arisen for testing the propriety of the

practice, and it would seem also to indicate the approval of the practice by the legal profession.

If the defendant's attorney fails to read the law to the jury, he quotes it from memory, and is not likely to be always accurate. A better practice is to read it from books of approved authority with such comments and explanations touching its application as the facts of the case may seem to warrant, and this appears the more proper when we reflect that in criminal cases, the jury, in a restricted sense, are judges of the law as well as the evidence.

The court gives the law, and the jury are bound to receive it as given, but in cases where the issue involves a mixed question of law and fact, they are necessarily the judges of the law and evidence, because they must apply the law to the evidence in order to determine the criminal intent with which the act was done. See *Pleasant* v. *The State*, 13 Ark., 360.

The defendant is entitled to the best defense his counsel can make for him, hence the necessity of having the law read and fully explained, and applied to the facts of the case, with all the skill, learning and eloquence which his counsel may possess.

But then there must be a limitation to this practice of reading law to the jury, and that limitation must be determined by the court in each case, under whose direction and supervision criminal trials take place.

It would not be safe or proper for us to prescribe fixed rules governing the Circuit Courts in such cases, and we shall not attempt it.

As to the first and second causes assigned for a new trial, to the effect that the verdict of the jury was contrary to the evidence and against the law and evidence; we think these causes well assigned, and that they warrant a reversal of the judgment.

The court's thirty-sixth instruction was calculated to mislead the jury. It was in substance, that if the jury found the defendant guilty of manslaughter, they should assess his punishment by imprisonment in the State penitentiary for any period not less than two years nor more than seven years.

The error of this instruction is, that it fails to discriminate and explain to the jury the difference between two grades of manslaughter.

Now manslaughter is *voluntary* or *involuntary*. This distinction exists at common law, and is fully recognized by our statute which has made no innovation upon the ancient law upon the subject.

The indictment in this case is for murder, and the jury might have found the defendant guilty of murder in the first degree, or of voluntary, or involuntary manslaughter, as the evidence might seem to warrant.

The verdict of the jury was as follows : " We, the jury, find the defendant not guilty, as charged in the indictment. But find him guilty of manslaughter and assess his punishment at two years in the State prison."

The jury, we have no doubt, intended to find the defendant guilty of voluntary manslaughter, without so declaring in words, for the penalty clearly indicates this purpose, and we should have no hesitation in treating the verdict as if for voluntary manslaughter, were we clearly of the opinion that the evidence authorized such a finding ; but, as we are not satisfied on that point, and as the finding might have been different, had the court declared and explained to the jury the distinction and difference of penalty, in two grades of manslaughter, the judgment must be reversed, and the cause remanded with instructions to the court below to grant the defendant a new trial, und that he be tried for manslaughter.