## TOMPKINS v. LITTLE ROCK & FT. S. RY. CO.

*(Circuit Court, E. D. Arkansas. 1883.)*

1. **LOAN OF STATE BONDS TO RAILROAD COMPANIES—ARKANSAS ACT CONSTRUED.**
   The act of the general assembly of the state of Arkansas, providing for a loan of the bonds of the state to railroad companies, required the companies receiving the state bonds to pay them; and, to secure compliance with this requirement, the act created a statutory lien on the roads of the companies receiving the bonds, and this lien stands as a security for the payment of the bonds in favor of the *bona fide* holders of the same.

2. **SAME—RULE FOR CONSTRUING SUCH ACTS.**
   The uniform and unvarying rule for the construction of statutes of this character is that all ambiguities are to be construed against the private corporation, and favorably for the rights of the state.

In Equity.

This cause first came before the court on demurrer to the bill. For a full statement of the case, and for the opinion of the court overrulling the demurrer, see 15 FED. REP. 6. Upon final hearing before Mr. Justice MILLER and District Judge CALDWELL the bill was dismissed in conformity with the opinion of the former. 18 FED. REP. 344.

*John McClure* and *John R. Dospassos,* for plaintiff.

*John F. Dillon* and *C. W. Huntington,* for defendant.

CALDWELL, J., *dissenting.* I dissent from the opinion of the court in this case. I agree with the court that the decision of the supreme court of the state, holding the act under which the bonds were issued unconstitutional, does not affect the rights of the parties to this suit; and that the case of *Railroad Cos.* v. *Schutte,* 103 U. S. 118, is conclusive on this point. Any expression of opinion as to the soundness of the decision of the state court or its binding force on this court is therefore unnecessary. The material question in the case is whether, under the act of 1868, the state had a lien on the roads of the companies receiving the state-aid bonds to secure their payment. The decision of this question turns mainly on the construction of the seventh and eighth sections of the act. I adhere to the opinion that a sound exposition of these sections was given in the opinion on the demurrer. The views there expressed are strengthened by the facts disclosed by the evidence at the hearing. It is not my purpose to repeat the views of the circuit judge and myself expressed in that opinion, but to notice briefly the reasoning by which the learned circuit justice arrived at a different conclusion.

The meaning of the words "tax" and "taxation" in the act seems to be plain, and their use appropriate. By the laws of this state, taxes are made a lien on the property on which they are assessed. A failure to assess and collect the taxes on real property for any year or number of years, does not deprive the state of the right to have its taxes for such period afterwards assessed and collected. Omission of

lands from the tax-books is not equivalent to payment of the tax, and is not a donation of the tax to the owner. The property is bound for the tax, which ought to have been assessed and collected, in whosesoever hands it may come; and when assessed for the omitted years, it is no answer to a demand for the taxes, that it was not on the tax-books for those years. Burroughs, Tax'n, § 93. Taxes, like the covenants of a deed, are the serfs of the soil, and follow it. *Worthen* v. *Badgett*, 32 Ark. 539. "By our laws, taxes are *glibæ ascripti*,—serfs of the soil,—a charge which follows the land in whosesoever hands it may go. And if the tax sale may be invalid to divest the title of the former owner by reason of irregularities and failure of the officers properly to discharge their duties, yet the purchaser is subrogated to the lien of the state." *Coats* v. *Hill*, 41 Ark. 149. The constitutional rule that taxes must be levied by a general rule, both as to rate and mode of assessment, has no application to this case. For a valuable consideration, which they have received and appropriated, the railroad companies agreed to pay the tax stipulated in the act, and they are estopped to deny its validity. *Furguson* v. *Landram*, 5 Bush, (Ky.) 230. This case is cited approvingly by the supreme court of the United States in *Daniels* v. *Tearney*, 102 U. S. 421, where the court says:

"In the case first cited (*Furguson* v. *Landram*) an injunction was applied for to prevent the collection of a tax, authorized by an act of the legislature passed during the late civil war, to enable the people of a country to raise volunteers and thus avoid a draft for soldiers, and that object had been accomplished. In disposing of the case the court well asked: 'Upon what principles of exalted equity shall a man be permitted to receive a valuable consideration through a statute procured by his own consent, or subsequently sanctioned by him, or from which he derived an interest and consideration, and then keep the consideration and repudiate the statute?' "

It is not a correct interpretation of the act to say this tax was to be assessed upon an invisible and intangible corporation. It struck deeper, and fastened itself on the road. There are two views to be taken of the act in this regard, either of which is fatal to the present pretensions of the companies. The right given to the state, "by the writ of sequestration, to seize and take possession of the income and revenues" of the company to pay interest, as it accrues, and the principal of the bonds of the state, itself imports and creates a lien on the road. The "income and revenues" of a railroad company include its "earnings." In *Ketchum* v. *Pacific R. R.* the act provided that the county bonds loaned to the company should be paid out of the "earnings of the said Pacific *Railroad*." On the final hearing of that cause, at the circuit, the learned circuit judge said:

"Upon consideration of the demurrer, we held that the effect of the legislation of the state, applicable to this transaction, and the acts and contracts of the parties, was to give to the county a lien, statutable in its origin, and equitable in its nature, upon the 'earnings' of the *railroad*, and upon the road and franchises of the company, as (so to phrase it) the mother of the earnings.

"Aside from this, and on general principles, if the doctrine laid down by Lord Chancellor Thurlow in *Legard* v. *Hodges*, 3 Brown, Ch. 531, 538, 'that where parties come to an agreement as to the produce of land, that the land itself will be affected by the agreement,' and equity will specifically enforce the agreement against the party who makes it, and all persons with notice,—if this doctrine is sound to the extent stated and applied in that case, (see S. C. 4 Brown, Ch. 421,) the county is entitled to have the 'earnings' arising from the property specifically applied as provided in the second section of the act of January 7, 1865. It would become a lien or charge upon the earnings, and the road out of which the earnings must necessarily come, effectual against the company and subsequent mortgagees and purchasers with notice." 2 Story, Eq. Jur. § 1231.

The supreme court affirmed this judgment, declaring the act of 1865 constituted a contract—

"By which the state, the railroad company, and the county appropriated the company's earnings to the payment of the interest on the county's bonds, such payments to continue until the bonds were paid off by the company. No subsequent legislation could deprive the county of the security thus acquired. Nor could parties who claim under subsequent incumbrances, and who are chargeable with notice of the appropriation made by the act of 1865, destroy the equitable lien of the county, even with the consent of the railroad company. With this lien the property itself was chargeable, by whomsoever it or the funds accruing therefrom are or may be held." *Ketchum* v. *St. Louis*, 101 U. S. 318.

In this case an appropriation of the "earnings" of a railroad was held to establish a lien on the "road and franchises of the company," effective against the company and subsequent purchasers and incumbrancers, because, in the language of the learned circuit judge, the road was "(so to phrase it) the mother of the earnings." In my judgment, the opinion of the court in the case at bar is irreconcilable with the reasoning and conclusion of the supreme court and the authorities cited in *Ketchum* v. *St. Louis*.

But the act of 1868 goes much further than the Missouri act. The act, upon the construction of which the case of *Ketchum* v. *St. Louis* turned, contained no declaration that the obligation of the company to pay the county bonds should constitute a claim or lien on the road. The seventh section of the act of 1868 provides:

"The taxation in this section provided to continue until the amount of bonds issued to such company, with the interest thereon, shall have been paid by said company as herein specified, in which case the said *road* shall be entitled to a discharge from all claims or liens on the part of the state."

The legal effect of this clause is the same as if it read that the claim or lien of the state on the road should not be discharged until the bonds were paid. It is immaterial whether the affirmative or negative form of expression is used; the intention is clear and the legal effect the same. It plainly shows the contracting parties must have intended and agreed there was a lien; and the courts will give effect to that intention, though not expressed in the most approved legal formula. It is the intention of the parties and not their grammar that courts look to in construing a contract. It is sufficient to

create a lien or mortgage that it appears in any part of the statute or contract, and by any form of expression, that it was the intention that it should have that effect. No special technical terms are required to constitute a mortgage or give a lien. 1 Jones, Mortg. § 166; *Whiting* v. *Eichelberger,* 16 Iowa, 422; *Johnson* v. *Crofoot,* 53 Barb. 574; S. C. 37 How. Pr. 59; *Weed* v. *Standley,* 12 Fla. 166; *Mobile & C. P. R. Co.* v. *Talman,* 15 Ala. 472; *Jackson* v. *Carswell,* 34 Ga. 279. When it is said that upon the payment by the company of the principal and interest of the state bonds, "the *road* shall be entitled to a discharge from all claims or liens on the part of the state," it is necessarily implied that the state has a lien on the *road* to secure the payment of her bonds, which is not to be discharged until they are paid. What is implied in a statute or contract is as much a part of it as what is expressed. The assertion that the word "lien" in the act is not used "in any clear or accurate sense," is not supported by any fact or argument to justify the reflection implied by it on the legislature that passed the act, or the people who ratified it by their votes at the polls.

It is a presumption of law that every clause and word of a legislative act was intended to have some reasonable meaning and effect, and it is the duty of the court to diligently search out such meaning and give it effect. Recognizing this rule, and the necessity of giving some meaning to the clause of the act in question, it is said that the words were used out of abundant caution to show the state would have no claim on the company after it had paid all the state bonds issued to it, and that there could have been no thought in the minds of the legislature that they were, by this clause, establishing a lien not already created. It is probably true that the legislature that submitted this act to the people for their ratification was not composed of the most enlightened men of the country, but it is safe to assert that there was not a man in that body who did not have intelligence enough to know that it was not necessary for the legislature to declare that the state should not have a claim or lien on a railroad for a debt after it had been fully paid; nor was there a man in that body who did not know there was no occasion for the legislature to declare that "the said road shall be entitled to a discharge from all claim or lien on the part of the state, if the state had no 'claim or lien' on the 'road.'" The construction placed on this clause by the court would make it vain and ridiculous. Such an interpretation is never placed on a statute when it is susceptible of any other. The legislature obviously supposed the right of the state "by writ of sequestration to seize and take possession of the income and earnings of said company," until the state bonds were paid, created a lien on the *road,* but out of abundant caution that purpose and intention found expression in terms in this clause, and its force and effect is not to be gotten rid of by a suggestion that the legislature did not use the word "lien" in any intelligible sense, and that the word "road" was

used for "company" for the sake of euphony. This argument is not consistent with itself; for, while it asserts the legislature did not possess intelligence enough to use the word "lien" in any clear sense, it at the same time assumes that that body was so mindful of the rules of grammar that the word "road" was used for "company" solely to avoid the repetition of the latter word. When referring to the obligations and promises to the state of the corporations receiving the bonds, the word "company" is rightly used, but the "lien" is appropriately located on the "road." Material words in a statute or contract, the meaning of which is understood by every man of common intelligence, are not to be stricken out on vague surmises. To do so is to make a new contract for the parties, instead of construing the one they made. Courts are forbidden to take such liberties with statutes or contracts.

But supposing the meaning of the act to be doubtful, what is the rule for its construction? Is it to be construed most strongly against the state or the company? If there is doubt, is the state or the company to receive the benefit of that doubt? These questions are answered in repeated judgments of the supreme court of the United States. The uniform and unvarying rule for the construction of statutes of this character is that they are to be construed strictly against the corporation and liberally in favor of the state. In a statute like this all ambiguities are to be construed against the private corporation and favorably for the rights of the state.

A few cases will be cited in illustration of this rule. Congress passed an act, making a grant of lands to the territory of Iowa, to aid in improving the navigation of the Des Moines river. A question arose as to the extent of the grant, which was referred to Judge BLACK, then attorney general, for his opinion. In the course of his opinion on the question he said:

"But for my own part, I have not the least doubt about it. My reason may seem paradoxical, but the very obscurity of the grant, in my judgment, makes it clear. It is out of these doubts that certainty grows. In every doubtful case we know very well what we ought to do as soon as we ascertain which party is entitled to the benefit of the doubt. We shall see who is entitled to it here. It is well settled that all public grants of property, money, or privileges are to be construed most strictly against the grantee. Whatever is not given expressly, or very clearly implied, from the words of the grant, is withheld. This is most especially true of legislative grants; and for very good reasons the rule ought to be adhered to with unyielding firmness. We all know the fact, and we are not bound to seem ignorant of it, that gifts like this are often caused by private solicitation and personal influence. The bills are almost universally drawn up by their special friends, and may be made ambiguous on purpose to disarm their opponents, or put suspicion asleep. If you let the grantees have the advantage of the ambiguity which they themselves put into their own laws, many of them will get a meaning which congress never thought of. Acts which were supposed to have but little in them when they passed, will expand into very large dimensions afterwards. An ingenious construction will make that mischievous which was intended to be harmless. The remedy for these evils—and they are evils

to the public morals as well as to the treasury—is to let all men know that they can get nothing from the United States except what congress has chosen to give them in words so plain that their sense cannot be mistaken." 9 Op. Attys. Gen. 275.

These views of Judge BLACK have the high sanction of the supreme court of the United States. A case involving the construction of the same act came before that court for decision and was argued for the United States by Judge BLACK. In deciding the case the court held the grant stood "on the same footing of a grant by the public to a private company," and that all such grants "are strictly construed against the grantees." The language of the court, in deciding that case, is strictly applicable to the case at bar, and would seem to be decisive of it. The court said:

"We concur with the following citation and reasoning of the plaintiff's counsel, to-wit: 'Lord ELLENBOROUGH, in his judgment in *Gildart* v. *Gladstone*, 1 East, 675, (an action for Liverpool dock dues,) says: If the words would fairly admit of different meanings, it would be right to adopt that which is more favorable to the interest of the public and against that of the company, because the company, in bargaining with the public, ought to take care to express distinctly what payments they are to receive, and because the public ought not to be charged unless it be clear that it was intended.' The reason of the above rule is obvious. Parties seeking grants for private purposes usually draw the bills making them. If they do not make the language sufficiently explicit and clear to pass everything that is intended to be passed, it is their own fault; while, on the other hand, such a construction has a tendency to prevent parties from inserting ambiguous language for the purpose of taking, by ingenious interpretation and insinuation, that which cannot be obtained by plain and express terms." *Dubuque & P. R. Co.* v. *Litchfield*, 23 How. 88, 89.

It will be observed that the rule we are considering is here applied to the case of a grant of lands by the United States to one of her territories. A territory is itself a public corporation, and might fairly be presumed to be incapable of lobbying and "private solicitation;" but, for the purpose of applying the rule, the court treated it as a "private company." In the case at bar private corporations are the beneficiaries of the act, and the rule and the reasons for it apply with all their vigor. Where a corporation claimed it was exempt from the obligation to pay taxes, the court said:

"The rule of construction in this class of cases is that it should be most strongly against the corporation. Every reasonable doubt is to be resolved adversely. Nothing is to be taken as conceded but what is given in unmistakable terms, or by an implication equally clear. The affirmative must be shown. Silence is negation, and doubt is fatal to the claim. This doctrine is vital to the public welfare. It is axiomatic in the jurisprudence of this court." *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 666.

In an earlier case the court used this language:

"The grant of privileges and exemptions to a corporation is strictly construed against the corporation and in favor of the public. Nor does the rule rest merely on the authority of adjudged cases. It is founded in principles of justice, and necessary for the safety and well-being of every state in the Union. For it is matter of public history, which this court cannot refuse to

notice, that almost every bill for the incorporation of banking companies, insurance and trust companies, railroad companies, or other corporations, is drawn originally by the parties who are personally interested in obtaining the charter.  *   *   *   And if individuals choose to accept a charter in which the words used are susceptible of different meanings,—or might have been considered by the representatives of the state as words of legislation only, and subject to future revision and repeal, and not words of contract,— the parties who accept it have no just right to call upon this court to exercise its high powers over a state upon doubtful or ambiguous words, nor upon any supposed equitable construction, or inferences made upon other provisions in the act of incorporation." *Ohio Life I. & T. Co.* v. *Debolt,* 16 How. 435, 436.

And see *Slidell* v. *Grandjean,* 111 U. S. 437; S. C. 4 Sup. Ct. Rep. 475.

This rule applies in every case where a private corporation seeks to obtain the property, money, or bonds of the state, or, having obtained the same, disputes the obligations it incurred in obtaining them. The constitution of 1868, under which the act was passed, provided the credit of the state should never be loaned for any purpose without the consent of the people expressed through the ballot-box. The legislature could do nothing in fact but submit to the people the proposition of the railroad company to borrow the bonds of the state. The contract was not made between the legislature and the companies, but between the legal voters of the state and the companies at the ballot-box. As we have seen, the court will take judicial notice of the fact that such bills are drawn, originally, by the parties interested in the scheme of the bill, and that it is to be construed in the light of this fact. In this case the active agency of the railroad companies continued beyond the passage of the bill by the legislature. To impart any validity to the scheme it had to be approved by the people at the ballot-box, and what was done to secure this result is part of the public history of the country, of which the court will also take judicial notice.

In *Daniels* v. *Tearney,* 102 U. S. 418, the court, in construing an ordinance of a convention, said:

"The circumstances which surrounded the convention and controlled its action are a part of the history of the times, and we are bound to take judicial notice of them." *Brown* v. *Piper,* 91 U. S. 37.

And in *U. S.* v. *Union Pac. R. Co.* 91 U. S. 79, it is said:

"But courts in construing a statute may, with propriety, recur to the history of the times when it was passed; and this is frequently necessary, in order to ascertain the reason as well as the meaning of particular provisions in it." *Aldridge* v. *Williams,* 3 How. 24; *Preston* v. *Browder,* 1 Wheat. 120.

It is part of the public history of the time that the promoters of this scheme represented to the people of the state, through the public prints and otherwise, for the purpose of influencing them to vote for the bonds, that the state would have a lien on the roads and franchises of the companies, receiving the state-aid bonds to secure their payment. It would be discrediting to the court to affect ignorance

of the known public fact in the history of the state that these representations were made, and that they were based on the language of the act which was quoted to prove there was a "lien" on the "road" that was not to be discharged until the state bonds were paid.[1] These are public historical facts known to every citizen of the state who lived at the period of their occurrence, and the evidence of which is extant in the columns of every public journal of the time. It was known then, as well as it is now, that to loan the bonds of the state to the companies, without reserving a lien on their roads, would be tantamount to a donation of the bonds to the companies receiving them. If the language of the act is ambiguous, the ambiguity is to be attributed, as we have seen, to the railroad companies receiving bonds under the act, and not to the people; and if these corporations used ambiguous words, knowing the people would take them to mean one thing, intending when the question came before the courts to contend that they meant something else, they are bound by the sense in which they intended the people should understand them. The opinion of the court fails to notice these canons for the construction of acts like this. They are founded on experience and a knowledge of the agencies by which such acts are usually brought into existence, and are well calculated to lead to a just and intelligent interpretation of them. They have the high sanction of the supreme court of the United States, and this court is bound to give effect to them. They are applicable to the statute under consideration, and remove the doubts, if any, as to its meaning. The money derived from the sale of the state bonds built, or aided to build, the road. The bonds were confessedly loaned for that purpose upon the agreement of the company to provide the means to pay them; and the question whether the act gives the state a lien on the road to secure compliance with the company's agreement to pay the bonds is certainly not to be determined by the application of rules as narrow and technical as any that would be applied to test the sufficiency of a plea in abatement.

To support the contention that the act of 1868 created no lien on the roads, reference is made to the act of March 18, 1867. The fifth section of that act provided that the receipt by any railroad company for the bonds loaned to it by the state should operate as a lien and mortgage on the road of any company receiving the bonds. It is said this act was repealed by the act of 1868, and from this premise

---

[1] The Little Rock *Republican*, the official newspaper of the state, in its issue of October 26, 1868, (the election was on the third day of November following,) contained this article: "The people are never to be taxed to pay any of these bonds, or any part of their contemplated state aid; the railroad companies having received such aid, must pay the interest, as well as the principal, of the same, as provided by section 7 of said act. The state simply becomes indorser, and only so, so far as the bonds are issued, which will be upon the roads actually completed; and in case of failure of any road to pay interest and principal, as provided in section 7, then the state will have the road and franchises for security, as provided in section 8."

it is argued that it had been found that companies would not accept
the state bonds and secure their payment by a mortgage on their
roads, and hence the repeal of that act and the passage of the act of
1868, omitting the fifth section of the act of 1867.    A sufficient an-
swer to this contention is found in the fact that the act of 1867 does
not contain the provisions of the seventh section of the act of 1868,
and that that section, so far as relates to a lien on the road, is in
legal effect the equivalent of section 5 of the act of 1867.    The refer-
ence to the act of 1867, assumes that that act, and the act of 1868,
are to be viewed as though the state was then in its normal condi-
tion, and the second act was passed as a substitute for the first after
it had been ascertained the first was deficient.    The facts of history
show the premises and deduction are without foundation in fact.    In
1864 the Union men of the state, then within the federal military
lines, by their own voluntary action, delegated some of their number
to form a constitution.    The constitution so formed was nominally
submitted to a vote of the people of the state, but there was no pre-
tense of an election elsewhere than inside the picket lines of the half
dozen federal military posts in the state.    The war was still fla-
grant, and outside of these military posts the confederate authority
dominated.    The skeleton of civil government thus formed was with-
out means, was not recognized by congress, and depended for its ex-
istence on the bounty and forbearance of the federal military author-
ities.    Its legislature twice elected senators to the congress of the
United States, who were refused admittance on the distinct ground
that there was no lawful state government in Arkansas.    Senators
elected by the legislature that passed the act of 1867 were rejected
on that ground.    It grew to have a little more consistency, but its
fate at all times was uncertain and doubtful.    Finally, congress, by
act of March 2, 1867, (14 St. 428,) declared "no legal state govern-
ment, or adequate protection for life or property, now exists in the
rebel state of Arkansas," (and other states named,) and that it "is
necessary that peace and good order should be enforced in said states
until loyal and republican state governments can be established."
And to effect this object the act provided "that said rebel states shall
be divided into military districts, and made subject to the military
authority of the United States, and for that purpose    *    *    *    Mis-
sissippi and Arkansas shall constitute the fourth district."

It will be observed that the act of congress declaring "no legal state
government existed" in the state of Arkansas, and providing a mili-
tary government for the state, was passed on the second of March,
1867, and the railroad act on the eighteenth of March, 1867; so that
16 days before the act of 1867 was passed by the legislature, the
whole state government had been denounced by act of congress as
illegal, and a military government provided for the state.    From the
time the act of 1867 was passed until the adoption of the consti-
tution of 1868, military authority was paramount.    Apprehension,

doubt, and distrust prevailed on every hand, and credit was prostrated. It would have been futile to attempt the construction of any work of internal improvement during this period. It was not attempted. Nor was this all. The state, in 1836, issued a large amount of bonds. Neither principal nor interest of a large portion of these bonds was ever paid, and the state had occupied the attitude of repudiating her debts for a period of more than 30 years. This deprived it of credit, and rendered its bonds comparatively worthless. New bonds, issued under the act of 1867, would have had no value whatever in any market, because, in addition to the low condition of the state's credit, there was the fact that, before the passage of the act of 1867, the body that passed it had been declared to be illegal by act of congress, and, after the passage of the act, forbidden to continue its session, by a military order. See House Journal 1867, p. 1007. The popular opinion at the time was universal that the acts of this government were nullities. The act was a dead letter from the moment of its enactment, for the reasons mentioned, and not because it provides for a mortgage on the roads.

The legislature that passed the act of 1868 was assembled under the constitution framed and adopted that year under the operation of the reconstruction acts. Between that government and the government which passed the act of 1867 there was not the least continuity or kinship. Probably no constitution and code of laws were ever adopted with so little reference or regard to the constitution and laws that preceded them.

There is, therefore, no foundation for the contention that the act of 1867 was regarded in framing the act of 1868, or that it throws any light on the proper construction of the latter act. The legislature that passed the act of 1868 provided for funding the hitherto repudiated bonds of the state, and made ample provision for paying the interest thereon. This action had the effect to restore the credit of the state, and its bonds, for some time thereafter, approximated par, and it was then, and not before, that the railroad companies sought the loan of the bonds to aid them to construct their roads. Nor did the act of 1867 remain in force until the passage of the act of 1868. It was abrogated before that by that provision of the constitution of 1868 which declared the credit of the state should not be loaned for any purpose without the consent of the people at the ballot-box,—a provision not contained in the act of 1867 or the constitution under which it was enacted.

As to the effect of the act of 1869, I have nothing to add to what is said in the opinion on the demurrer. Both were public acts, and all persons were bound to take notice of the lien accruing to the state under them. *Memphis & Little R. R. Co.* v. *State,* 37 Ark. 642; *Ketchum* v. *St. Louis, supra.* The statutes relating to the registry of mortgages have no application to a lien created or arising under a public statute in favor of the state.

The defendant company, now owning the road, is in no plight to set up the plea of innocent purchaser. It acquired the road by purchase at a sale made under a decree foreclosing a mortgage executed by the old company to secure its own bonds, after the award of state aid, and the lien of the state had attached under the act of 1868. The bill filed in that case set out the fact of the award of state aid, and the receipt of the state bonds by the company under the act of 1868, and that the road had been placed in the hands of a receiver under the provisions of the act of 1869, and one of the prayers of the bill was that the mortgaged property might "be sold subject to the lien of the state of Arkansas," if such lien was found to exist, and to be prior to that of the mortgage set out in the bill. The state was not a party, and could not be made such, and, no bondholder intervening, it was not possible to adjudicate the question in that case. The purchaser at the foreclosure sale was bound to take notice of all liens, the existence of which were disclosed in the bill. *Brant* v. *Virginia Coal Co.* 93 U. S. 326. At the foreclosure sale the present company, or parties acting for it, purchased the property, consisting of 100 miles of completed and equipped railroad, for $50,000. The difference between the amount of the bid and the value of the property is suggestive. To the construction of this property, thus bid in for $50,000, the state contributed, by loan of her bonds, the sum of $1,000,000. That the purchase was made subject to the prior lien of the state is not left to conjecture. The decree confirming the sale declares that the new company shall, as part of the consideration of the conveyance to it of the mortgaged property, "compromise or pay such claims against the Little Rock & Fort Smith Railroad Company as C. W. Huntington, George Ripley, and Henry A. Whitney may, within one year from the date hereof, approve, and upon such terms and in such manner as they may prescribe, subject to the approval of this court." It appears Gookin, Page, and others presented to the committee, named in the decree of confirmation, claims for money advanced by them to pay interest on the state-aid bonds, issued to the Little Rock & Fort Smith Railroad Company. On the ninth of December, 1875, the committee filed their report on these claims, in which they say:

"Prior to the first day of January, 1871, the state of Arkansas loaned its credit to the Little Rock & Fort Smith Railroad Company to the extent of $800,000 of its 7 per cent. currency state-aid bonds, issued under the act approved July 21, 1868, entitled 'An act to aid in the construction of railroads.' * * * It was the duty of the company, under the act, under penalty of sequestration of its income and revenues, to furnish the money requisite to pay this interest, but no provision had been made to that end. * * * In order to avoid the penalty of sequestration, which would increase the complications then existing, and render it much more difficult to relieve the company from its embarrassment, certain persons advanced the moneys, and paid to the state of Arkansas said sum of $28,000, with which the coupons upon said $800,000 state-aid bonds, payable April 1, 1871, were paid. * * * These advances were made to meet a pressing emergency. The old company

was relieved from a debt which threatened a sequestration of its income, and the new company, [the present defendant,] when it comes to settle with the state, will receive credit for the amount thus paid. In fact, every member of the new corporation equally enjoys the benefit of this payment, and it is not just that a few persons should be compelled to bear the burden which all should carry."

The significance of this report, which was confirmed by the court, is enhanced by the fact that the chairman of the committee making it was a trustee by substitution in the mortgage executed by the old company, and as such was a party complainant in the suit in which that mortgage was foreclosed, and, as attorney for the trustees, filed the bill and procured the decree of foreclosure in that suit, and continued to act as a trustee and attorney for the new company. These facts are a guaranty that the report was not the result of imperfect information, or hasty and inconsiderate action. It was the work of one familiar with all the facts, and the law applicable to them, and in view of his relation to the parties it is safe to assume it expressed their understanding at the time. The language of the report, that "the new company, when it comes to settle with the state, will receive credit for the amount thus paid," conclusively shows that the present defendant purchased, expecting to pay off the state-aid bonds as a prior lien. This is further confirmed by the fact that the new company, between the date of its organization and the date of the decision of the supreme court of the state, in June, 1877, holding the act under which the bonds were issued unconstitutional, purchased in state-aid bonds to the amount of $627,000, exclusive of interest, which bonds it now holds. These bonds were obviously purchased to be used in extinguishing the state lien. The defendant is unable to give any other explanation of their purchase. The indefinite and unsatisfactory statement in the answer that the defendant "did buy and invest a part of its corporate funds" in these bonds "as an asset," is equivalent to a confession of the charge in the bill that they were purchased to be used in discharging the state lien.

It is immaterial whether the security given by the companies to the state was given in terms for the latter's indemnity, or for the absolute payment of the bonds. If it was given to the state for her indemnity, as accomodation maker of the bonds, equity will treat it as a pledge for the payment of the bonds, and will compel its application to that purpose. This principle is now too well settled to admit of doubt or discussion. Sheld. Subr. §§ 155, 163; *Moses* v. *Murgaroyd*, 1 Johns. Ch. 129; *Rice's Appeal*, 79 Pa. St. 206; *Hand* v. *S. & C. R. Co.* 12 S. C. 314; *Kelly* v. *Trustees*, 58 Ala. 498; *Colt* v. *Barnes*, 64 Ala. 108; *Young* v. *Montgomery & E. R. R.* 2 Woods, 606; *Holland* v. *State*, 15 Fla. 455; *Florida* v. *Florida Cent. R. Co.* Id. 723; *Hampton* v. *Phipps*, 108 U. S. 260; S. C. 2 Sup. Ct. Rep. 622.

The justice and equity of this rule finds its readiest illustration and application in cases where the maker of accommodation paper

who has taken security from the principal debtor for the payment of the debt becomes insolvent. In such cases equity will subrogate the holder of the debt to the security held by the accommodation debtor. In the case at bar the principal debtor is in the attitude of repudiating her accommodation bonds, and it would be in the highest degree inequitable and unjust to deny to the innocent holders of those bonds the benefit of the security the state holds for their payment.

This doctrine was not denied by the court in *Chamberlain* v. *St. Paul R. Co.* 92 U. S. 299. The holder of the state bonds failed in that case because the state had foreclosed the lien taken for its indemnity, and sold the property to innocent purchasers, long before the bondholder instituted his suit. The court held the purchasers from the state were unaffected by the constructive trust relation existing between the state and the holders of its bonds. The case went off on the ground that "where the property is not affected by any specific lien or trusts in the hands of the state, her transfer will pass an unincumbered estate;" and on the additional ground of lapse of time.

In the case at bar the state has not parted with the security to an innocent third party, and is not in possession of the property. The property is within the jurisdiction, and may be made to respond to a decree of the court without affecting injuriously the rights of the state. If the state was suable, it would be a necessary party; but the fact she cannot be sued does not prevent the bondholder from asserting his equity against the property which can be reached. As between the state and the railroad company, the state is to be regarded as a surety, and the company the principal debtor. The bonds are the accommodation paper of the state loaned to the company for its accommodation. The security is given and is to continue "until the amount of bonds issued to such company, with the interest thereon, shall have been *paid by said company.*" This is a covenant for the payment of the bonds by the company, and the statutory lien stands as a security for that purpose to every holder of the bonds. The security was designed, and by the express terms of the act appropriated, exclusively to the payment of the principal and interest of the bonds. No provision was made for the state to pay the bonds in any contingency. In *Railroad Cos.* v. *Schutte* 103 U. S. 118, it is distinctly held that where the lien was given to the state to secure the payment of its bonds a holder of the bonds could avail himself of that security independently of the doctrine of subrogation. That case is also conclusive upon the point that the invalidity of the act under which the bonds were issued cannot avail the company as a defense.

The latter doctrine had previously been established by that court in *Daniels* v. *Tearney,* 102 U. S. 421, where it is said to be well settled "that where a party has availed himself, for his benefit, of an unconstitutional law, he cannot, in a subsequent litigation with others not in that position, aver its unconstitutionality as a defense, although

such unconstitutionality may have been pronounced by a competent judicial tribunal in another suit. In such case the principle of estoppel applies with full force and conclusive effect. *Furguson* v. *Landram,* 5 Bush, (Ky.) 230. See *Same* v. *Same,* 1 Bush, (Ky.) 548; *Van Hook* v. *Whitlock,* 26 Wend. 43; *Lee* v. *Tillotson,* 24 Wend. 337; *People* v. *Murray,* 5 Hill, 468; *City of Burlington* v. *Gilbert,* 31 Iowa, 356; *Burlington, C. R. & M. R. Co.* v. *Stewart,* 39 Iowa, 267." To this list of cases cited by the court may now be added *Railroad Cos.* v. *Schutte, supra,* and *Jamison* v. *Griswold,* 2 Mo. App. 150; S. C. 6 Mo. App. 405.

The plaintiff is entitled to a decree.

The principles here announced apply to the case of *Williams* v. *Little Rock, M. R. & T. Ry.*