SMITH *v.* FLORIDA CENT. & W. R. CO. *et al.*

*(Circuit Court, N. D. Florida.* August, 1890.)

NEGOTIABLE INSTRUMENTS—RAILROAD BONDS—BONA FIDE HOLDER—FRAUD.

In a suit to enforce the collection of railroad bonds which had been declared fraudulent it appeared that the bonds were given to a firm of which plaintiff was a member in payment for work alleged to have been done for the railroad company, and that another member of said firm was an active participant in the fraud which rendered the bonds invalid. *Held,* that plaintiff was not an innocent holder.

In Equity.

*C. L. Robinson, C. K. Davis,* and *J. W. Losey,* for complainant.

*John A. Henderson,* for defendants.

SPEER, J. This is a bill filed by the complainant, who avers himself to be a citizen of the state of Wisconsin, residing at La Crosse in that state, against the Florida Central & Western Railroad Company, a corporation created by and under the laws of the state of Florida, having its place of business at Jacksonville in said state; the Florida Central Railroad Company, a corporation created by and under the laws of the state of Florida, having its place of business at Jacksonville, in this district, against Sir Edward J. Reede, who is an alien, and the subject of the queen of Great Britain and Ireland, and against J. Frederick Schutte, Jans Prins, Adrianus Prins, and 28 others, who are aliens and subjects of the king of the Netherlands, and against the Guarantee Trust & Safe-Deposit Company, a corporation created by the laws of the state of Pennsylvania, and a citizen of that state. The bill is brought to enforce the collection of 376 bonds of the Florida Central Railroad Company for $1,000 each, which will be hereafter more particularly described. It is one of several cases, which it seems have sought to avoid the decision of this court, subsequently affirmed, in *Schutte* v. *Railroad Co.* 103 U. S. 127. The history of this litigation is familiar. The decree in the *Schutte Case* was rendered in this court by Mr. Justice BRADLEY, as circuit justice. That decree held that the trustees of the internal improvement fund of the state of Florida had the first lien upon this and other railroads to secure the sum of $464,175.37, with interest thereon since March 20, A. D. 1869, at the rate of 8 per cent. per annum. That the complainants, who are many of them defendants here, should have a second lien upon both railroads before mentioned, and upon the entire interests of the Jacksonville, Pensacola & Mobile Railroad Company between Quincy and Chattahoochee, to the amount of all the bonds of the state of Florida held and owned by them, mentioned in the pleadings in the case, and numbered 3,000 and under, together with the interest. That the amount of said state bonds now owned by the complainants was $2,751,000, and the interest now matured amounted to $1,655,001. That the complainants had a first lien upon the railroad running from Lake City to Jacksonville to the amount of the bonds of the state of Florida exchanged for the bonds of the Florida Central

Railroad Company, numbered 3,001 and upwards, held and owned by them, with the interest. The amount of the last-numbered bonds is $197,000, and the amount of interest now matured is $118,515.20. That the railroad and property and franchises extending from Lake City to Chattahoochee, including the branch road to Monticello, mentioned in the bill of complaint in this case, and the railroad from Tallahassee to St. Marks, and the property and franchises pertaining thereto, be each sold subject to the lien thereon, fixed by the decree to satisfy the lien of the said complainants thereon. That the sale be made by Sherman, Conante, and Hawkins, as special masters, and be advertised for at least 90 days before the day of sale in some newspaper of general circulation published in Jacksonville, and also in some newspaper of general circulation published in the state of New York. That the purchaser or purchasers at said sale may deposit with said special masters in payment of his or her bid the said Florida state bonds numbered 3,000 or under, in the proportion which the whole amount of the bid bears to the whole amount of the said state bonds outstanding, and 97 numbered 3,001 or under, and the interest matured thereon, which is $4,406,001.60. *Fifth.* That the said railroad from Jacksonville to Lake City be sold by the said special masters at the same time to satisfy the lien of complainants declared by the decree. That the purchaser or purchasers at said sale shall be authorized to deliver to the special masters, in payment of the bid, said bonds of the state of Florida numbered 3,001 and upwards, in the proportion which the whole amount of the bid bears to the whole amount of said state bonds outstanding, numbered last as aforesaid; that is, $315,515.20. *Sixth.* That the balance of every bid for either of the roads hereby directed to be sold above the amounts to be paid in bonds shall be paid in cash, and at the time of said sale, and, if not paid at once, the masters shall immediately reoffer said property for sale, etc. The amount paid in cash at either of the sales shall be paid into court by the masters, to be disposed of by the court on the coming in of the said master's report. After said sale or sales shall be confirmed the purchaser or purchasers shall be placed immediately in possession of the property purchased. *Seventh.* That, unless the purchaser of the railroad from Lake City to Chattahoochee, and the branch to Monticello, and the railroad from Tallahassee to St. Marks, shall, within one year from the date of the sale thereof, discharge and satisfy the liens of the trustees of the internal improvement fund of the state of Florida thereon, respectively, as hereinbefore declared, then the said railroad property and franchises thereto respectively pertaining extending from Lake City to Quincy, including the branch road to Monticello, and the railroad property and franchises thereto belonging extending from Tallahassee to St. Marks, shall be taken possession of and sold by the marshal of the United States for said district, separately, to satisfy the liens thereon respectively fixed by this decree, and said decree shall be advertised to take place at Tallahassee, in said state, in a newspaper of general circulation published in said Tallahassee, and also in a newspaper of general circulation published in

the city of New York, at least 90 days before the day of sale; and the purchaser or purchasers at said sale or sales may pay to the marshal for satisfaction of their bid for either of said roads the bonds which are a lien upon said road,—that is, the bonds to pay which the last vendor exists as declared by this decree, in the proportion which the whole bid bears to the whole amount of bonds, which were a lien as aforesaid on said road, and shall pay the balance in cash at the time of said sale, and the marshal shall return said bonds so received by him and the balance, if any, of cash into court, to be disposed of as the court shall direct. This decree was, upon appeal, affirmed by the supreme court of the United States in the case of *Railroad Cos.* v. *Schutte,* above mentioned. The bill before the court prays that all proceedings subsequent to the decree above mentioned in the *Schutte Case* made as to the balance be evaded and annulled and set aside, or that the decree may be so modified that plaintiff's rights may be established in said suit, and said property resold. He prays further that the entire line of railroad from Jacksonville to Lake City, and all property appurtenant thereto, may be decreed to be subject to and charged with the mortgage lien in favor of the plaintiff for the amount of his said bonds and interest thereon, and that the said property may be sold to satisfy the same, or that his rights in the premises against those who claim the property under the decree may be enforced upon such terms as may be equitable, and that he may have the benefits of the provision of the statutes of the state of Florida, which created a lien on said railroad for the security and payments of his bonds; that the defendants, and each of them, may be enjoined from operating said railroad, or in any way interfering with it or any of said property, pending this action; that a receiver of said railroad and property may be appointed by the court pending this litigation; that the defendants, and especially the defendant the Florida Central & Western Railroad Company, may account for the rents and profits of said railroad and property since it has had possession thereof. There is a prayer for subpœna as to all the parties heretofore mentioned.

Without stating more in detail the voluminous record in this case, which, under the stipulations, involves 1,472 pages of printed matter, and besides all of the other evidence taken, which is voluminous, the ascertainment of the right of the controversy will be greatly facilitated by the consideration of the case of *Trask* v. *Railroad Co.,* 124 U. S. 515, 8 Sup. Ct. Rep. 574. The facts are sufficiently stated in the opinion of the court, delivered by Mr. Chief Justice WAITE:

"The suit was brought by Spencer Trask to collect 192 of the 1,000 bonds of the state of Florida issued to the Florida Central Railroad Company, which were the subject of consideration by this court in *Railroad Cos.* v. *Schutte,* 103 U. S. 118. In that case it was decided that, although the bonds were void as against the state, the railroad company that sold them was estopped from setting up their invalidity as a defense to an action brought by a *bona fide* holder to enforce the lien the company had given on its property to secure their payment. Accordingly a decree was rendered establishing the lien of the holders of 197 bonds on the railroad of the company, and ordering a sale

to pay the amount due thereon. Trask now claims to be a *bona fide* holder of the 192 bonds he sues for, and seeks the same relief as to them. He concedes the invalidity of the bonds so far as the state is concerned, but as against the railroad company and its property claims the benefit of the same estoppel that was adjudged in the other case to exist in favor of those who recovered there.

"The general facts as to the issue of the bonds are stated in the *Case of Schutte*, beginning at page 127 of the volume in which it is reported, (103 U. S.) The correctness of our findings then is not denied now. Indeed, Trask relies upon that decision as the basis of his right to recover, and the only disputed question is whether he does in law and in fact occupy the position of a *bona fide* holder. That is substantially a question of fact only, and it presents itself in a double aspect. Trask got his title from Thomas B. Coddington, and the inquiry is, first, as to his own position separate from that of Coddington, and, if that is not sufficient, then, next, as to that of Coddington, under whom he claims. We have carefully considered the testimony bearing on these questions both in the record as it has been printed in the present case, and in that of the *Schutte Case*, brought into this also by stipulation. It would serve no useful purpose to refer to this testimony in detail, and it is sufficient to say that we have had no difficulty in reaching the conclusion that Trask, as a purchaser of the bonds, occupies no better position than Coddington, from whom he bought. His purchase was made September 12, 1881, at an auction sale in the city of New York. The bonds had then been running ten years and more, and no interest had ever been paid upon them. As the sale was made under the agreement of August 29, 1872, Trask is chargeable with notice of the contents of that instrument, which showed on its face that the bonds had been the subject of litigation, and had not been obtained by Coddington in the ordinary course of business. His debt, for which they were held, was $40,000, and the bonds, without interest, which had been running ten years at eight per cent. per annum, amounted to $192,-000. As the bonds were state bonds, the mere fact that no interest had ever been paid furnished the strongest presumptive evidence that they were dishonored. The interest alone, if collected, would much more than pay the debt for which the bonds were held. The circumstances connected with the sale also were entirely inconsistent with the idea of a purchase of commercial paper in good faith for a valuable consideration without notice. No one present at the time could have had any other understanding than that the sale was of bonds which had been commercially dishonored. We are equally well satisfied that Coddington was never in any commercial sense a *bona fide* holder of the bonds. According to his own testimony, he was originally the mere agent of those who were engaged in perpetrating the fraud upon the railroad company, and employed by them to get the bonds from Florida to London, so that they might be sold, and a large part of the proceeds applied to the payment of the personal debts of one of the guilty parties. He undoubtedly did that because he had been told that it would enable 'the parties in interest' to pay him the cash for $24,465 of coupons of another company, for which they were bound. He entered into no contract with the Florida Central Company, and it could never have been supposed by him that any part of the proceeds was to be paid into its treasury or for its use. He could not but have known that the whole purpose of his employment was to get the bonds to London, where they had been contracted to be sold at a price that would yield less than half their face value, and that he was himself to apply more than half of this to the payment of the individual debts of one of the large stockholders of the company, by whose influence and in whose interest the railroad bonds had been executed, to be exchanged for the state bonds, which he was to take away. Under such circumstances, it is certain

that he could have acquired no lien on the bonds as security for any services he might render in transferring them to London, or for any liability he had incurred to third parties in order to get the bonds away. His contract for the service, and for the compensation he was to receive, was not with the railroad company itself, but with the president of the Jacksonville, Pensacola & Mobile Railroad Company, who was engaged in appropriating the bonds issued to the Florida Central Company to his own use. This disposed of his claim of lien on account of his services and liabilities as agent. He was not the agent of the Florida Central Railroad Company, and, as it must be conceded that those for whom he was acting had no title as against this company, there was nothing in his hands to which any lien could attach in his favor any more than in favor of his principals.

"As to the contract made with the Jacksonville, Pensacola & Mobile Company on the 29th of August, 1872, by which the 192 bonds were given to Coddington as security for a debt owing him by that company, little need be said. The Jacksonville, Pensacola & Mobile Company had no legal right to the bonds, and it could not, therefore, pledge them as security for its debts. All this Coddington knew, or ought to have known. And besides, when this contract was made, the fraud and illegality in the original issue of the bonds, both by the railroad company and the state, had become notorious, and it is impossible that Coddington, situated as he was, could have been ignorant of the facts. In order to get the bonds away from Florida he was compelled to arrange with certain stockholders of the Florida Central Company, who had begun a suit to prevent their removal by the president of the Jacksonville, Pensacola & Mobile Company, on the ground that he had no right to use the road of the Florida Central Company, 'and cover it with liens to raise money to pay private debts, notwithstanding he is the owner of a majority of the stock.' It is unnecessary to refer more particularly to the evidence. It is full and conclusive, and leaves no doubt on our minds as to the knowledge of Coddington of such facts as would prevent him from acquiring any title to the bonds he took away by purchasing them from any of the parties engaged in the transaction, which he could enforce as a *bona fide* holder against the Florida Central Company."

The complainant in this case, according to the stipulation in evidence in the case, had practically come into the possession of the bonds which he seeks to enforce in August, 1882. The decree, the substance of which we have set forth, was rendered in this court in favor of Schutte on the 31st day of May, 1879. It was affirmed by the supreme court of the United States in October, 1880. The sale under the decree of all the property of the Florida Central Railroad Company, including everything which is sought to be evaded by the prayers of the bill here, was made in February, 1881, and was confirmed by the court in the same month. The deed conveying the title to this railroad property was made to Sir Edward Reede, and Reede conveyed to the Florida Central & Western Railroad Company, organized under the general laws, for the purpose, among others, of holding and operating these purchases. All of that is made to appear by the stipulations and the copy of the deed from Sir Edward Reede to the Florida Central & Western Railroad Company.

It is insisted by the defendants with great force, that the stockholders of this last-mentioned organization were innocent holders, taking the property upon the faith of the judicial decrees of this court, having the high sanction of the supreme court of the United States. It is true, also,

.that the issues in this case were made upon the same theories presented by the complainants in the *Trask Case*, and, indeed, were standing for hearing when the supreme court affirmed in that case the decree of this court. The plaintiff attempts to evade the decision in the *Schutte* and *Trask Cases*, and especially the latter, by insisting that he is a *bona fide* holder of these bonds, without notice, and that a certain deed of trust between the Jacksonville, Pensacola & Mobile Railroad Company, and C. L. Chase, T. H. Flagg, and D. G. Ambler was an actual application of the bonds therein sued on to the partnership of which the plaintiff was a member, for the construction of the line of road from Quincy to Mobile. This deed will be found in the Schutte record, pages 1454-4 -5-6 and -7. He insists further that the actual delivery of the bonds —which, as we have seen, did not take place until August, 1882—was such a delivery as related back to the date of the trust-deed, October, 1871, or at any rate to the time when the work was done. But it seems that this contention has been directly negatived by the decision of the supreme court of Florida in the case of *State* v. *Railroad Co.*, 15 Fla. 709. The court held that the instrument in question did not support the claim of a sale of its bonds to the trustees mentioned. It is not alleged in the bill that the complainant and his partners, the Florida Construction Company, ever contracted to receive these bonds for their work of construction, or to take their pay in bonds. Such does not appear to be the fact. The proper construction of the instrument above referred to will lead to the conclusion that they were to be paid in money; and if, after the bonds had been declared invalid by the most lofty tribunals in litigation which was made notorious from one end of the country to the other, and indeed in Europe, they then having failed to obtain the money, accepted the bonds in consideration of work previously done, they cannot, with any force whatever, insist acceptance of the bonds would relate back to their original construction contract in such manner as to avoid the effect of the decree, nullifying their bonds and transferring the properties upon which they purport to be a lien. It appears, too, that the Florida Central Railroad Company was an entire stranger to this instrument. It appears to be nothing but an attempt to provide cash with which to make the payments to a firm of which the plaintiff was a member; nor was the plaintiff a party to it. The construction company of which he was a member was ousted by a pre-existing contract, and acquired no rights under this deed of trust. In the *Case of Trask, supra,* Coddington acquired possession of his bonds pending the litigation in the *Schutte Case,* while here the possession came on after the decree and the sale, and after the property covered by the liens therein declared had passed into the hands and ownership of a company whose every stockholder was apparently an innocent purchaser for value without notice, and indeed with all the encouragement which comes from the decision of a court of final resort. Trask was held chargeable with notice of all that Coddington knew. Coddington having notice of the *mala fides* of this entire transaction, which was notorious throughout the country, it was held to attach to Trask.

It appears from the evidence that in the transaction in consequence of which the complainant insists he received these bonds he was a partner with one E. G. Smith and one Converse S. Chase and one J. H. Gardner, the firm name being "The Florida Construction Company." This is plain from the Schutte record, page 1453. This is otherwise shown from the transcript of the Leon county judgment, hereinafter to be mentioned, and the assignment of May 27, 1879. Converse S. Chase was a trustee for the Florida Construction Company, as well as a member of it, and it follows that notice to him of the unlawful character of these bonds was notice to his partner, the complainant. Wade, Notice, § 59; *Stevens* v. *Goodenough*, 26 Vt. 676. On the 11th of April, 1879, three years before the complainant received the bonds, Chase testified as follows: "I know there were some bonds issued about that time to said Railroad Co.; about three thousand, according to my recollection." Being asked by counsel whether any question was raised about the validity of the bonds, he answered: "There was quite a controversy about that time about the constitutionality of issuing those bonds. I of course know that from reading it in the public press and by hearing it. Again I visited Europe in June, July, August, and September, 1872. My visit was in reference to said bonds, for the sale of the same. · I found the bonds being held by one John Collinson and a Dutch syndicate." On the next page he states that he received a telegram containing this expression with reference to certain litigation: "State and company hopelessly discredited, unless," etc. "Also there were damaging reports in Europe. I learned them first from Mr. John Collinson in person, on the 4th day of July, 1872; and the reports were published in a Dutch paper in Amsterdam, as I was informed, at the time, though I could not read the paper." On page 701 of the Schutte record the partner of the plaintiff further is recorded as testifying to the effect that these bonds were disposed of at a price of 40 cents on the dollar. He admits that he knew of their unconstitutionality and illegality being matter of common report. So damaging were these reports that the agent Collinson requested Chase to procure from the attorney general of Florida, the judge of Florida, and the governor, statements to counteract these damnatory reports. This duty was admirably performed, as we see from pages 1239 and 1240 of the Schutte record. The testimony thus received from high officials in Florida was unquestionably misleading, and Chase himself was active in attempting to contradict the damaging statements in reference to the bonds which were being considered by the shrewd and wary financiers of Holland. He knew that the interest on the bonds was to be provided for out of the proceeds of sale of other bonds. They took out, says Chase, the payment for 3 coupons on 2,800 bonds, which amounted to about £95,400, or about $460,736 in gold. By thus selling these fraudulent bonds to pay matured interest on bonds of a similar character, these conspirators, against the credit and honor of the state of Florida, sought to give them a temporary and delusive value on European exchange. Chase himself was charged with the sale of 1,200 bonds, including the 396 involved in this controversy. He attempted

to compromise litigation pending in London involving these bonds by their fraudulent misapplication. He identifies a consent decree in which he was concerned, and to which his signature is attached, (page 28, Schutte record,) the decree being taken in the English chancery, and he testifies this decree, which involved these bonds, was never complied with, and that the bonds were never otherwise disposed of to his knowledge. It would be difficult to imagine a stronger array of facts to bring home to the partner of the plaintiff the knowledge of the worthlessness of these obligations. It is insisted, however, that the 1,200 bonds of which the plaintiff's 360 were a part were specially dedicated to the purposes of the construction company, which we have seen was no company at all, at least no corporation, but merely a partnership. It is true, however, as appears from the record, that at the date of the trust-deed under which the construction company claims, their 1,200 bonds were subject to what is known in the history of this famous litigation as the "Houston Draft." This draft was for $16,326.70. The agreements to that effect appear solemnly signed by M. S. Littlefield, the president of the Jacksonville, Pensacola & Mobile Railroad Company, and by Edward Houston. Two hundred and ninety-four of these bonds were excessively issued, and with great scrupulousness were afterwards returned and cared for. This appears in a memorandum of compromise proposed by Converse S. Chase to settle all outstanding claims and differences. The third point in this memorandum is important. It reads as follows:

"*Thirdly.* The proceeds of the balance of the bonds to be used to repay the Florida Construction Company for the money expended by them on the works of the J., P. & M. R. R. Co., and in satisfaction of several claims of all the other creditors of the company."

This memorandum must not have been effective, although it is clear from its third clause that the construction company was not to have the negotiable paper itself as *bona fide* holders, but merely the proceeds. Instead of relying on the bonds the construction company should have proceeded against those persons or corporations who employed but did not pay them. But it appears that Littlefield and his associates had other uses for these bonds. Two were lost, but the remainder, or the proceeds of their sale, were to be equally divided between Littlefield for himself and his company on the one hand, and the Western North Carolina Railroad Company on the other part. We observe, therefore, that the burdens placed on these 1,200 bonds, including the 396 of the plaintiff, were of an onerous and multitudinous character. As we have seen, they were to satisfy in part a decree of the English chancery on the other side, to meet the draft of Edward Houston on this side, to satisfy the demands of the Florida Construction Company, and finally to be divided dollar for dollar between Littlefield for the company and the Western Division of the Western Railroad of North Carolina. It will not be difficult to understand in all of these historical transactions that Chase, occupying a threefold relation,—of partner with the complainant, trustee for the construction company, and attorney in fact for the railroad company,— became saturated with the knowledge of the vicious character of these

transactions, and it is equally demonstrated that the plaintiff shared the legal responsibility of this knowledge with him. See pages 1242, 987, 988, of the Schutte record. See, also, pages 722–724 of the same record for Collinson's reply to a proposition of Chase, in which he is fully put on notice of the fraud upon the state and all parties he is contemplating. Other stupendous frauds upon the state of Florida and its railroad were developed by this same agent, contractor, and partner for the plaintiff. They are fully presented in the Schutte record, and have been passed upon by the supreme court of the United States. The New York World, a paper of wide circulation, had called the attention of the public to this matter in its article of Wednesday, June 15, 1870. After stating the issue of the bonds, the article states that the bonds first above mentioned have already been issued, and are on their way to New York, and some of them to Europe, it is said for negotiation. It is well, perhaps, that capitalists should be put on their guard. Attention is called to the clause of the state constitution upon which these bonds were finally declared unconstitutional. The article prints extracts from a letter of George W. Swepson of North Carolina, to which reference has already been made, as the president of the Western Division of the Western Railroad of North Carolina, with whom it was stipulated that his road should receive the "dollar for dollar" division of a large portion of these bonds. It is addressed to Gov. Reid, and it reads as follows:

"I regret my inability to be in your town during the extra session of the legislature. General Littlefield has the bills and act, and will fully explain everything to you. * * * You will remember, when in New York our agreement was this: You were to call the legislature together, and use your influence to have our bills passed as drawn by us, and if you were successful in this you were to be paid $12,500 in cash."

The legislature was accordingly convened in extra session only about three months after its regular session, and did pass the railroad bill required of them. But, the majority not then being thoroughly corrupted, a clause was inserted in the act authorizing the issue of the bonds after a severe struggle requiring the railroad company to give to the state mortgage security for its protection. This clause, though notoriously adopted by both branches of the legislature, was found to have mysteriously disappeared from the act as signed by the governor, among the rolls of the secretary of the state. A bill in chancery was therefore filed to enjoin the issue of the bonds, on the ground that the act authorizing their issue had been fraudulently changed by Littlefield and his associates, or by their procurement and for their benefit. The injunction was granted by the court, and no motion was ever made by the parties to have it dissolved. At the next session of the legislature, held in January last, the operations of the railroad ring thus arrested by the court were renewed at the capitol, and a bill was actually prepared by these shameless parties, introduced, and passed, whereby validity was given to the law pronounced void by the court for fraudulent alteration of it, with authorization for the issue of bonds in immensely augmented quantities. And it is under this bill, claiming to be a law, that the four millions of Florida state

bonds now on their way to northern and European markets for negotiation have been issued. See pages in the *Schutte Case*, 682, 683. But this is not all. S. M. Hopkins & Co., the London agents, in view of the questionable character of the bonds, were given permission by Littlefield to sell the bonds at 50 cents on the dollar, and less, in order to induce buyers. This was done, and they were afterwards at £128. 10s. 1d.

This lamentable array of fraud and corruption is recounted to show the impossibility that a man largely interested, as he insists, with Chase in these transactions could be ignorant of their notorious and universally understood character. The "construction company," as we have seen, was at no time entitled to these bonds. It was stipulated that they should be paid from the proceeds of a portion thereof; but if they had taken the bonds after the occurrences herein set out had been passed on by the state courts of Florida, by the circuit court for the United States for this district, by the supreme court of the United States, and given besides the widest publicity in this country and in Europe, it is asking too much of a court of equity to believe that a subsequent holder of these bonds, himself a contractor on one of the roads to build which the bonds were ostensibly issued, could be ignorant of their character, and therefore a *bona fide* holder for value; and this view is irrespective of the representations of Chase above presented. Smith, the plaintiff, must have had knowledge of the truth in the *Schutte Case*. It was to marshal the assets of the wrecked corporation, to determine priority of loans, and to award the property in kind. The plaintiffs in the *Schutte Case* were obliged to buy the Florida Central Railroad to protect themselves from loss. It is impossible to doubt, notwithstanding this denial, that the plaintiff might have intervened and asserted his rights on that trial, and he is now estopped. Mr. Henderson, in the brief filed in the record, gives a record of the ultimate disposition of these bonds, which is satisfactory to the court, but which it is not necessary to reproduce here.

It appears further from the evidence that the Florida Construction Company, though never having built any of the railroad, had judgment on award for arbitration for all of its claims for work and material. This amounted to $36,000. Chase and Glagg, trustees under the deed of trust providing for the payment of the proceeds of sales of certain bonds to the work of construction, operated the road from October, 1871, until the receiver took charge, in the spring or summer of the year 1882. They have never accounted for the earnings, although, as we have seen, Chase was a partner in the construction company. It is insisted that the revenue from this source alone was more than three times the debt of the construction company, and payment to Chase was payment to the company. Be this as it may, if the construction company relied upon their award, which is yet unsatisfied, it is difficult to understand how for the same debt the company, or a member thereof, can lawfully claim to be the *bona fide* holders of $396,000 worth of bonds. It is insisted, further, that Chase never in any way accounted for £19,200, which it is asserted was received by him in the sale to Collinson of the bonds; and the application of this statement, which the court is, however, not

able to decide upon the facts, is that, being a member of the construction company, the payment to him of this amount was payment for that company. It seems indisputable, however, from the evidence that Converse S. Chase left Florida, and has never returned to protect the interests of his construction company, the management of his trust, the development of the Florida railway system, or any of the litigation. He does not appear in the litigation again except to testify that not one of the bonds numbered above 3,000 was ever issued or sold. This he testified in New York. Besides, it does not appear that Smith was ever a purchaser of these bonds. The Florida Central Company never owed him a dollar; and it does not appear that he credits any account against the company or against the Jacksonville, Pensacola & Mobile Company, because of the possession by him of these bonds.

There was offered in evidence on the trial, and admitted subject to the objection of defendants' counsel, a judgment in favor of the Florida Construction Company against the Jacksonville, Pensacola & Mobile Company, and also the record of a case from a Minnesota state court between Smith, the plaintiff, and the same company. This was offered on the trial, and it was objected that the time for hearing or taking testimony had long passed, and no sufficient reason was shown for opening the case. It was objected, further, that there were no allegations in the bill to support such proofs, and that there was a manifest inconsistency between the evidence offered and the facts as stipulated in the case. Also that the defendant was in no way a party to the proceedings in Minnesota; that they were collusive and fraudulent. The depositions of Smith were also offered. It was objected that they were wholly *ex parte*, simply an affidavit made in a foreign and remote jurisdiction. The judgment of the construction company against the Jacksonville, Pensacola & Mobile Company was on an award of arbitration of all matured demands and claims. This was entered in Leon county, and never made a matter of record in any county in which the property of the defendant is situate. It is objected that the plaintiffs in that submission are not a corporation, but were only partners, and the title was simply the firm name. It is stated that the construction firm never built any of the extension contracted for; that the road even now extends only from Quincy to Chattahoochee; and that the constructed portion of the Jacksonville, Pensacola & Mobile Company is the 21 miles from Quincy to Chattahoochee. It is stated that Gibbs built for the company, Davis & Bunkwright being the subcontractors; that these parties had separate suits in the state court for compensation, and intervened in this case for payment. See *Gibbs* v. *Drew*, 16 Fla. 147. As to the Minnesota judgment, if it were otherwise admissible when offered on the argument, we would be compelled to regard it as an additional step in the tortuous journey of fraud which has traveled its slow length through the vast record before the court. It plainly has no jurisdiction of the defendant company. That the same M. S. Littlefield, whose unscrupulous and daring corruption stains wellnigh every page of this record, assisted in the work of obtaining this judgment, by collusion,—a judgment of over $900,000,—to be added

to the award of $36,000 after full submission of all claims, shows how the Minnesota court was misled. The judgment of the Minnesota court, without jurisdiction of the subject-matter or the parties, must be regarded as a nullity so far as this case is concerned.

Like the *Trask Case*, the controversy here is mainly of fact, and, as we have seen from a lengthy review of the evidence, which the court has felt it incumbent to attempt in a case of this magnitude, it is impossible to doubt that the plaintiff fully understood the illegality and fraudulent character of his bonds when he received them. The notorious character of the men with whom he and his agent dealt, the continuous and unblushing wrongs which they perpetrated, were known to the country, and have received the scathing condemnation of the supreme court of the United States. "Littlefield's character," says Chief Justice WAITE in *Railroad Cos. v. Schutte*, 103 U. S. 144, "as it appears all through this voluminous record, is not such as to entitle him to any favorable consideration as a witness or otherwise. He and Swepson have both shown themselves capable of the most shameless frauds, and we cannot but look with suspicion upon everything they do or say." In the later *Case of Trask*, 124 U. S. 515, 8 Sup. Ct. Rep. 574, the reasoning of the court, as we have seen, is fully applicable to the case at bar. Coddington, whose bonds were held as invalid and of no effect in his hands, had bought them at an auction sale September 12, 1881. The plaintiff obtained his in 1882. No interest had been paid on either. No one can believe that either Coddington in that case, or Smith in this case, was in any commercial sense a *bona fide* holder of the bonds.

It is difficult to understand at this period of peace, prosperity, and enforcement of law, how our country's history could have been sullied by such shameless occurrences as we have been obliged to recall, and the participants escape the severest penalties of the outraged law. They occurred, however, when the vast caldron of revolution, boiling by the fierce and lurid fires of civil war, had thrown to the surface much of the scum of society. Good men of all parties were powerless in the hands of these adventurers, who, in that period of public prostration, rode into places of influence on the wave of corruption and ignorance. The opportunity for such blots upon the history of the country is fortunately past; and the patriotic, the pure, and the wise should be ever careful lest that opportunity may return with its resulting paralysis to such empires as the state of Florida. A most anxious and deliberate consideration of this record has induced the conclusion that the prayers in the bill should be all denied, and that it be dismissed at the plaintiff's cost.